(No. 13178.—Reversed and remanded.)

PHILIP WILLIAMS BADDELEY *et al.* Appellants, *vs.* KATE DODSON WATKINS *et al.* Appellees.

*Opinion filed June 16, 1920.*

1. WILLS—*when record in will contest case must be free from error.* Where the evidence as to the mental capacity of the testatrix is sharply conflicting and closely balanced the record must be free from prejudicial error in the rulings of the court on the admission of evidence or the giving of instructions.

2. SAME—*when witness should not express opinion that testatrix understood what property she owned.* A witness in a will contest case whose conversation with the testatrix was limited to ordinary topics having no reference to her property should not be permitted to express an opinion that the testatrix was able to know what property she owned.

3. SAME—*what questions as to the mental capacity of a testator are for the court.* What degree of mental capacity is necessary to enable a testator to make a valid will, to what extent and with what degree of perfection he must understand the will and the persons and property affected by it, or to what extent his mind must be impaired to render him incapable, are questions of law exclusively for the court.

4. SAME—*when opinion of non-expert witnesses is incompetent.* Non-expert witnesses should not be permitted to answer the question whether or not in their opinion the testatrix had sufficient mind and memory to recall to mind her property and to make disposition of it understandingly according to some plan she had formed in her mind, as the determination of that question is for the jury.

5. SAME—*when opinion of non-expert witness is unnecessary.* Where a witness has detailed a conversation with the testatrix regarding the nature and extent of her property and the objects of her bounty, it would not be ground for reversal to allow the witness to give an opinion as to whether the testatrix understood the nature and extent of her property and the objects of her bounty, but such an opinion is unnecessary.

6. SAME—*when rule against permitting witness to say whether testator could make a will is violated.* The rule against permitting a non-expert witness to express an opinion as to whether a testator or testatrix was mentally capable of making a will is violated by allowing such witness to give an opinion on the separate propositions as to whether the testatrix was able to understand what property she owned, who were the natural objects of her bounty,

and whether she was able to make disposition of her property understandingly according to some plan formed in her mind.

7. SAME—*when non-expert witness cannot express opinion on mental condition of testatrix when will was signed.* A non-expert witness cannot give her opinion as to the mental condition of the testatrix on the day of the execution of the will, where she has seen the testatrix only once, and that on a day some three months after the will was executed.

8. SAME—*when non-experts should not be allowed to express opinion as to mental condition.* Non-expert witnesses should not be permitted to express an opinion as to the mental condition of a testator or testatrix until it is shown by the preliminary examination that they have had an acquaintance long enough and association frequent enough to enable them to observe such mental condition.

9. SAME—*when it is proper to limit jury's consideration of former will.* Where a former will, which is variant from the will in contest, is admitted in evidence on the question whether the testatrix was of sound mind when she afterwards made statements as to the contents of such former will, it is proper, by an instruction, to limit the jury's consideration of the former will to such question, as it is not admissible generally.

APPEAL from the Circuit Court of Champaign county; the Hon. FRANKLIN H. BOGGS, Judge, presiding.

H. LEONARD JONES, GREEN & PALMER, and HERRICK & HERRICK, (ORIS BARTH, of counsel,) for appellants.

DOBBINS & DOBBINS, for appellees.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

This appeal is prosecuted to review a decree of the circuit court of Champaign county sustaining the will of Sophia Dodson, deceased.

Sophia Dodson died at Champaign, Illinois, October 7, 1917, seized of three pieces of real estate located in that city and possessed of a small amount of personal property. Her only surviving heirs-at-law were certain nieces and nephews, none of whom were mentioned in her will. She had lived in Champaign more than seventy-five years.

When a little girl she lived in the home of the grandfather of the principal contestants, Marian, Phillip and Maurine Baddeley, children of Charles H. Baddeley, deceased. After she was married to William Dodson, Charles H. Baddeley, then a small boy, went to live in the Dodson home and lived there a number of years. After he attained his majority he became associated with William Dodson in the grocery business and continued in the partnership until the death of Dodson, in 1905. After the death of her husband Sophia Dodson went to live in the home of Charles H. Baddeley and remained there until December, 1915. Charles H. Baddeley died July 24, 1915, but Mrs. Dodson continued to live in the home with Mrs. Baddeley and her children. The proponent, Kate Dodson Watkins, came to the Dodson home when she was a little girl and lived with them until her first marriage. Two attempts were made to adopt her and two void orders of adoption were entered, the first being void because Mrs. Dodson did not join in the petition requesting the adoption, and the second order being void because Kate Dodson had attained her majority. She was, however, considered by Mrs. Dodson as her adopted daughter and was referred to by Mrs. Dodson as her daughter. Kate Watkins has one child, Howard Dodson Watkins. During the time Mrs. Dodson lived in the Baddeley home Kate Watkins was living in Kansas.

Sophia Dodson made four wills during her lifetime, the second and fourth being in the handwriting of the testatrix. The first, dated March 25, 1912, gave $500 to a sister then living, and divided the remainder of her property equally between Charles Baddeley and his children and Kate Watkins and her child. The second will was executed December 9, 1915, the day following the afternoon when Sophia Dodson was taken from the Baddeley home to the Watkins home, and it divided one piece of the real estate into three parts, giving a third each to Howard Watkins and Phillip Baddeley and a third to Marian and Maurine

Baddeley. All the other property was given to her "adopted daughter, Kate Dodson Watkins." On January 7, 1916, the instrument being contested in this suit was executed. By this instrument she devised all of her real and personal property to her "adopted daughter, Kate Dodson Watkins," and appointed her executrix without bond. The last of the series of wills was made January 10, 1917, and was in the following language:

"CHAMPAIGN, ILL., *Jan. 10, 1917.*

"I want my adopted daughter Kate Watkins to have all the property I have this is my last will.            SOPHIA DODSON.

Witnesses: Nellie E. Fleming, Mary F. Wingard."

Twenty-one witnesses testified on behalf of the proponent. From their testimony substantially the following facts appear: January 7, 1916, Sophia Dodson requested M. A. Nelson to bring an attorney to her home to draw her will and to bring William Dallenbach and A. E. Wuesteman to act as witnesses. The attorney, the three witnesses and a stenographer went to the home of Mrs. Dodson. The conversation between the attorney and Mrs. Dodson was taken down in shorthand by the stenographer. It appears from a transcript of this conversation that Mrs. Dodson wanted her will drawn so that all of her property would go to Kate Watkins. In the conversation she mentioned the three properties that she owned, and said she was making this will of her own accord and without request from anyone. She stated that she was born in 1834. The will was dictated to the stenographer and was written on a typewriter which had been brought to the house. While the will was being dictated and transcribed by the stenographer the three witnesses visited with Mrs. Dodson. All of them had known her for many years and the conversation was concerning family affairs and topics of common interest between neighbors and friends. She expressed her displeasure with the Baddeleys because they had caused a conservator to be appointed for her in November, 1915.

She stated that she was taking the precautions in making her will because she wanted to show the Baddeleys that she was not crazy. On the 23d of January following the execution of this will Dr. John Dallenbach and Dr. J. T. McKinney were called by the proponent. When they came Mrs. Dodson asked them to examine her to determine her mental condition. She told the physicians that the Baddeleys had made a record at the court house that she was crazy and that she wanted the witnesses to examine her to show that she was not crazy. She told these physicians where she was born, the names of her parents, the age at which she came to Champaign, about her marriage, and about Charles Baddeley and proponent living with her as children. She told them many things concerning her family history and the family history of the physicians, but most of the occurrences she related had taken place in her early life. She said that she had signed the will of March 25, 1912, to satisfy the Baddeleys and to "prevent a rumpus." She told them it was prepared by Charles Baddeley and read over to her once, and that after she signed it it was taken by Charles Baddeley and that she had not seen it since. She remembered in a general way what it contained. She told the physicians about changing this will and leaving all her property to proponent. She also told them of an operation which she underwent for the removal of cataracts from her eyes and of the trouble the nurses had in preventing her from pulling the bandages from her eyes. She told the physicians that she wanted the conservator discharged, but that she wanted someone to attend to her business for her because she was nearly blind and did not hear well. While she lived at the Baddeley home she communicated regularly with proponent, who lived in Kansas. After the death of Charles Baddeley she often expressed the wish that her daughter would come back and make a home for her in the old homestead. In November, 1915, proponent returned to Champaign. December 8, 1915, proponent's

husband came for Mrs. Dodson and took her to his home. She sent for her wearing apparel and other articles at the Baddeley home after she decided to stay with the Watkins family. A year after she began making her home with the last named family she wrote the following letter to the county judge:

"*Dec. 16, 1916.*

"*Judge*—I wanted to have the court fix my business so I could do what I please. If Baddeleys lawyers had to see if I am foolish they will say I am for thats what Baddeleys want. I want to wait till good weather & go before more than one sided lawyers. Baddeleys want my property & I would turn over in my grave if they got it I know what I want to do. If I am old I aint feeble minded. I have put Baddeleys where they are and this is what I get but the Bible says 'Vengeance is mine I will repay saith the Lord.'     Sophia Dodson."

All of the witnesses for proponent detailed short conversations on every-day subjects and then expressed the opinion that the testatrix was of sound mind.

Twenty-four witnesses testified on behalf of contestants. The following facts appear from an examination of their testimony: During the ten years that Sophia Dodson made her home with the Baddeleys she was treated with affection and considerate kindness by all the Baddeley family. She was treated as a member of the family and affectionately addressed by them as "Aunt Fi." Her hearing was very poor, and from the time she came there, until 1913, her eyesight failed rapidly, resulting that year in total blindness. During this period she was attended by the Baddeley family. Her room was fitted up for her comfort and convenience and was cared for by the family. She ate at the table with the family and her food was put on her plate and prepared so that she could eat it. Dr. Cleaves Bennett went to the home at the request of Charles Baddeley about the year 1913 for the purpose of making an examination of Mrs. Dodson to determine whether or not anything could be done for her to make her stronger and more comfortable. He found her quite deaf and almost

blind and in a condition of general decline and advised
Baddeley that medicine would not remedy her condition.
Dr. Charles H. Spears, an eye and ear specialist, treated
testatrix from 1905 to 1914. In 1905 her physical condi-
tion was that of the average person of seventy-five. She
gradually lost strength with progressing age and her hear-
ing and sight also gradually failed. By 1913 senile cataract
had developed and she became blind. She was suffering
from arteriosclerosis, which is frequently accompanied by
senile cataract. These cataracts were removed by operation
December 16, 1913, and after that she developed a condi-
tion known as "acute insanity," manifested by picking at
the covers and bedding and trying to tear the bandages
from her eyes and talking incoherently. A nurse watched
her constantly. For the first ten days after the operation
she did not know what she was doing or talking about but
after that she improved gradually, so that by the end of
the third week she was taken to the Baddeley home. Dr.
Spears expressed the opinion that she was not of sound
mind during 1913 and 1914 and that at her age that con-
dition does not improve. December 8, 1915, when Watkins
came to the Baddeley home for Mrs. Dodson, she hesitated
about going. Mrs. Baddeley urged her to go and helped
her make what preparations were necessary for a short
visit. When she left, Mrs. Baddeley kissed her good-by
and said to her, "Aunt Fi, remember you always have a
home here; come back whenever you get ready." She
never returned to the Baddeley home but remained at the
Watkins home from that time until her death. On No-
vember 4, 1915, a summons was served on Mrs. Dodson
in the proceeding to appoint a conservator. Sheriff Harry
S. Evans tried to explain to Mrs. Dodson the meaning of
the papers but could get no response from her. Walter B.
Riley, master in chancery of the circuit court of Cham-
paign county, was appointed guardian *ad litem*. In prepar-
ing to represent Mrs. Dodson at the hearing he went to the

Baddeley home and tried to talk with her about the matter. He found her in poor physical condition but found her surroundings comfortable. He tried to make her understand the nature of the proceeding that had been brought but was not able to get an intelligent answer. Charles McFarland had been employed for several years in the Baddeley home to drive their car and do general work about the home. He had known testatrix since 1909. In 1915 he took the Christmas presents from the Baddeley family to Mrs. Dodson to the Watkins home. Two of the Baddeley children went with him and Phillip climbed on testatrix's lap and she caressed him and seemed greatly pleased to see him. McFarland later made a trip to the Watkins home on an errand but was not permitted to see Mrs. Dodson. All of the witnesses for contestants, after detailing conversations and relating incidents, expressed the opinion that Sophia Dodson was from 1913 to the date of her death of unsound mind.

The testimony for the respective parties is hopelessly in conflict and cannot be reasonably reconciled. The question whether or not the testatrix was of sound and disposing mind and memory at the time of the execution of the will of January 7, 1916, was for the jury to determine, and because of the conflicting testimony and the almost equally balanced evidence on the subject of the mental condition of the testatrix the court would hardly be justified in finding that the verdict of the jury sustaining or setting aside the will was contrary to the manifest weight of the evidence. On the other hand, this condition of the record requires that the question be submitted to the jury free from prejudicial error in the rulings of the court on the admission of evidence or the giving of instructions.

The great majority of the witnesses testifying in this cause detailed short conversations concerning trivial everyday matters and then expressed an opinion as to the mental condition of testatrix. Though many of the witnesses

293 — 26

for proponent had no conversation with the testatrix regarding her property and no conversation with her regarding the persons whom she might consider the natural objects of her bounty, yet they were permitted, over the objection of contestants, to answer the following series of questions put by proponent's counsel:

1. You may state whether or not, judging from those matters which you have detailed to the jury, in your opinion she was able to understand what property she owned.

2. You may state, judging from the matters you have detailed to the jury, in your opinion whether or not she had mind and memory enough to remember who were the natural objects of her bounty.

3. You may state, judging from the same matters you have detailed to the jury, whether or not in your opinion she had sufficient mind and memory to recall to mind her property and to make disposition of it understandingly, according to some plan she had formed in her mind.

Substantially these questions were put to fifteen of proponent's witnesses, and to some of the witnesses the questions were re-cast in different language and the series lengthened to five or six questions of similar character. In *Dowdey* v. *Palmer*, 287 Ill. 42, this court said: "The real question is whether, at the time the will was made, the testator had sufficient mind and memory to remember who were the natural objects of his bounty and to recall to mind his property and make disposition of it understandingly, according to some plan formed in his mind." Our holding there was in accordance with the long established law of this State, but the language used does not justify the conclusion that this is a question for the witness to decide. It is the question for the jury. What degree of mental capacity is necessary to enable testator to make a valid will, to what extent and with what degree of perfection he must understand the will and the persons and property affected by it, or to what extent his mind must be

impaired to render him incapable, are questions of law exclusively for the court, with which witnesses have nothing to do. Opinions of non-expert witnesses are admissible in cases of this character where such opinions are based upon the knowledge and observations of the witnesses. This class of evidence is admissible only when, from the nature of the subject under investigation, no better evidence can be obtained, or it cannot be so detailed or presented to the jury that they can draw the proper inferences and form an intelligent judgment. The opinion and conclusions of a witness are not admissible where the jury, acting as such, is equally capable with the witness of forming an opinion or conclusion from facts to which the witness may testify. (5 Ency. of Evidence, 662.) If the facts can be detailed and placed before the jury so that the jurors, as men of ordinary intelligence, can fully understand the matter and draw the proper inferences and conclusions and there is no necessity for opinion evidence, such evidence, whether the opinion of an expert or non-expert, is inadmissible. (1 Elliott on Evidence, 791.) When a witness testifies from observation of a man that he is young or old, sober or intoxicated, pleased or angry, sane or insane, his testimony is not mere opinion,—it is knowledge; but it is knowledge gained from an observation of numerous and subtle characteristics, which would be difficult, if not impossible, to adequately describe to the jury except by stating the conclusion naturally reached by the mind of the observer. (*Craig* v. *Southard,* 148 Ill. 37.) Where witnesses have had no conversation with the testator regarding the property of the testator, it is clearly error to permit the witness to express an opinion on whether or not the testator was able to know what property he owned. It is not an opinion expressed from knowledge but it is purely a guess or supposition of the witness, and such statements are not within the rule which allows witnesses to state their conclusions from facts which they have observed and which are incapable of being

fully described to the jury. Where the witness has discussed with the testator the nature and extent of his property and has discussed with him his family and the persons whom the testator considers the natural objects of his bounty, the witness may relate these details to the jury and leave the jury to draw their own conclusions. It was clearly error to permit the witnesses to express an opinion in answer to the third question of the series. This court has repeatedly held that it is error to ask a witness whether or not the testator was mentally capable of making a will. The practice of splitting this ultimate question into its several parts and permitting the witness to express opinions on the several parts is just as vicious as the practice we have already condemned. In *Baker* v. *Baker,* 202 Ill. 595, we held that objections were properly sustained to questions "whether or not the testator, at the time of making the alleged will, had sufficient mind and memory to understand the will in question," "whether or not he was able to carry in his mind and memory the nature and extent of his property," and "whether or not he was able to understandingly execute a will." In *Garrus* v. *Davis,* 234 Ill. 326, we held that a witness, expert or non-expert, might give his opinion as to the condition of the testator's mind and whether testator was sane or insane, but that the witness ought not be permitted to assume to advise the court and jury as to the degree of mental capacity necessary to enable the testator to make a valid will. In *Wetzel* v. *Firebaugh,* 251 Ill. 190, we said: "Questions put to witnesses whether the testatrix was able to understand the business in which she was engaged when she made this will or able understandingly to execute it, simply called for conclusions of the witnesses as to testamentary capacity and amounted to an attempt to put the witnesses in the place of the jury and allow them to determine the very question which the jury had been sworn to try." In *Bailey* v. *Beall,* 251 Ill. 577, we held that it was improper to ask witnesses whether,

from their acquaintance and conversations with and knowledge and observation of the testator, they believed he had sufficient mental capacity, at the time he signed the instrument, to engage in making a last will and testament and understand the nature and effect of the act. In *Teter* v. *Spooner,* 279 Ill. 39, we held that it was improper to permit a witness to express an opinion as to whether the testator was of a positive character or whether he was easily influenced. We there said: "It is the province of witnesses in a case of this kind to give the jury the facts within their knowledge, and it is the province of the jury to form an opinion as to the inferences to be drawn from these facts." We are aware of no decision of this court which justifies receiving the opinion of the witness on matters contained in the third question of the series. Where the witness has detailed a conversation with the testator regarding the nature and extent of testator's property and regarding the natural objects of testator's bounty, it would not be reversible error to permit the witness to answer the first two questions of the series, (*Voodry* v. *University of Illinois,* 251 Ill. 48,) but the opinion of the witness is then unnecessary and should not be given. In this case no such foundation was laid for the opinion of the witness and it was error to permit it to be expressed.

Mrs. Fred Dallenbach testified that she met testatrix once in April, 1916; that she was at the Watkins home possibly an hour, was introduced to her and spent the hour visiting with proponent and testatrix. During the course of the hour she had some little conversation with testatrix regarding the affection of her eyes and ears, but there was nothing said during the visit that impressed her particularly. With this foundation she was permitted to answer questions similar to those previously set out in this opinion. The questions were made more objectionable by limiting the opinion of the witness to the date of the execution of the will in question. For instance, the third of

the series of questions was, "Based upon the same matters, have you an opinion as to whether or not, on the 7th of January, Sophia Dodson was able to recall to her mind her property and make disposition of it understandingly according to some plan formed in her mind?" It seems too clear for argument that this witness was not only not qualified to give any opinion on the mental capacity of testatrix, but particularly to give an opinion of the mental condition of testatrix on a day more than three months prior to the only. time she ever saw her. Non-expert witnesses cannot give their opinion as to the mental condition of the testator on the day of the execution of the will when they did not see him on that day. (*Blake* v. *Rourke,* 74 Iowa, 519, 38 N. W. 392.) The same error was committed in permitting witnesses Mrs. Nellie Fleming and Mrs. M. A. Nelson to express an opinion as to the testatrix's mental condition on January 7, 1916, without proof that they saw her on that day. Non-expert witnesses should not be permitted to give an opinion regarding the mental condition of a testator until it is shown by a preliminary examination that they have had an acquaintance long enough and intercourse frequent enough to enable them to observe the mental condition of the testator. (14 Ency. of Evidence, 372; 2 Jones' Com. on Evidence, 882.) Unless the witness details conversations, incidents, facts and circumstances sufficient to impress the mind of the man of common experience that the witness has a knowledge of testator's mental condition and that his opinion is not a guess, supposition or speculation, the court should not permit the witness to express an opinion. *Hettick* v. *Searcy,* 278 Ill. 116; *Walker* v. *Struthers,* 273 id. 387; *Brainard* v. *Brainard,* 259 id. 613; *Graham* v. *Deuterman,* 244 id. 124; *Grand Lodge I. O. M. A.* v. *Wieting,* 168 id. 408.

Contestants contend that the court erred in giving proponent's 17th instruction, which reads as follows:

"The court instructs the jury that the instrument purporting to be a will signed by Sophia Dodson in the presence of witnesses Gillespie and Davidson [this being the will of March 25, 1912,] has been permitted to go to the jury solely upon the question whether or not the testatrix was of sound mind when she afterwards made statements, if any shown by the evidence, in reference to the contents of a prior will made by her; that you are not to consider said will as giving any rights or interests in her property which would bar her from thereafter making another will, nor are you to consider said will as any admission on the part of the testatrix that the legatees and devisees therein named were at the time of the signing of the instrument in this case the natural objects of her bounty or entitled to any interest in her estate."

The provisions of the will of March 25, 1912, were different from the provisions of the will of January 7, 1916. Testimony regarding the contents of a former will, or the will itself, is not admissible where the terms of such will are variant from the will in the suit. (*O'Day* v. *Crabb,* 269 Ill. 123; *McCune* v. *Reynolds,* 288 id. 188.) In view of the testimony in the record tending to show that this will of March 25, 1912, was prepared out of the presence of testatrix and read to her but once, and in view of the condition of her hearing, we think it very doubtful whether this will should have been admitted in evidence for any purpose, and if it was to be admitted in evidence it was proper to limit the purpose as it is limited in the given instruction.

For the errors indicated the decree is reversed and the cause is remanded to the circuit court of Champaign county.

*Reversed and remanded.*