(No. 52176.—

CYNTHIA LYNCH *et al.*, Appellees, v. THE BOARD OF EDUCATION OF COLLINSVILLE COMMUNITY UNIT DISTRICT NO. 10, Appellant.

*Opinion filed September 15, 1980.—Rehearing denied November 26, 1980.*

GOLDENHERSH, C.J., and MORAN, J., concurring in the decision.

RYAN, UNDERWOOD, and WARD, JJ., dissenting.

Walker & Williams, of Belleville (James C. Cook, of counsel), for appellant.

Robert C. Nelson, of Belleville, for appellees.

MR. JUSTICE CLARK delivered the decision of the court and the following opinion in which MR. JUSTICE KLUCZYNSKI joins:

The plaintiffs, Cynthia L. Lynch, by her father and next friend, Raymond L. Lynch, and Raymond L. Lynch, individually, filed a two-count complaint in the circuit court of Madison County on September 12, 1975. In count I Cynthia sought damages from the defendant, the board of education of Collinsville Community Unit District No. 10, for injuries she suffered during a "powder-puff" football game held at the Vandalia campus of the Collinsville high school on October 27, 1974. Count II consisted of the same pleaded facts, but damages were sought by Raymond Lynch for the expenses he had incurred as a result of Cynthia's injuries. An amended complaint was filed on October 9, 1975. It added a paragraph to each count of the original complaint alleging that the defendant possessed insurance coverage. The defendant filed an answer on January 6, 1976. On March 21, 1977, the plaintiffs filed a second amended complaint which consisted of four counts. Upon a motion to dismiss, the court ordered, on April 6, 1977, that counts I and III be dismissed. The defendant filed an answer to the remaining counts. Thereafter on March 9, 1978, the first day of trial, the court granted the plaintiffs' motion to reinstate counts I and III of the second amended complaint. In count I, Cynthia alleged that the defendant was negligent in failing to provide her with protective equipment. In count II, Cynthia alleged that the defendant was wilfully and wantonly negligent by failing to supervise the football game. In counts III and IV, Raymond Lynch repeated the allegations of counts I and II, respectively. At the conclusion of the trial, a jury returned a general verdict for Cynthia in the amount of $60,000; the jury returned a verdict against Raymond Lynch on counts III and IV. Judgment was entered on the verdicts on March 15, 1978.

Subsequently, Cynthia, by now of age, was substituted as party plaintiff in her own name. The defendant's post-trial motion to vacate the judgment was denied by the trial court on August 13, 1978. The defendant appealed to the Appellate Court for the Fifth District. The appellate court, with one justice dissenting, affirmed the judgment of the circuit court. (72 Ill. App. 3d 317.) We subsequently granted the defendant's petition for leave to appeal. 73 Ill. 2d R. 315(a).

Since an issue is raised herein as to whether the jury's verdict in favor of Cynthia was against the manifest weight of the evidence, a detailed recitation of the facts is warranted. We note, incidentally, that since no appeal was taken from the judgment entered against Raymond Lynch the merits of that judgment are not before us.

The plaintiff, Cynthia Lynch, was playing quarterback on the junior girls' football team on October 27, 1974. She had thrown a pass to a teammate when she was struck in the face by an opposing player and knocked down. The back of her head struck the ground with considerable force. Cynthia was taken to the hospital by her parents, who had been at the game as spectators. The hospital records admitted into evidence at the trial reveal that Cynthia suffered a small linear fracture of the nasal bone. The senior girls eventually won the game 52 to 0.

From the voluminous testimony adduced at trial it appears that the junior-senior "powderpuff" football game had been played each year as a half-time event of the homecoming varsity football game from 1970 to 1973. In 1974, when Rodney Woods became the principal of Collinsville high school, he ordered that the game not be held during half time of the homecoming game. Nevertheless, several students approached some of the teaching faculty and requested them to coach the girls' teams. Three teachers agreed to do so. None of the three teachers had been hired by the district to be coaches. It is not

entirely clear from the record, but between four and six practice sessions were held in preparation for the football game. These sessions were held after school on school grounds. The girls changed their clothes in the school locker room prior to the practices. It is unclear whether a school football was used in either the practice sesssions or during the game. There was testimony that one of the footballs was supplied by a student while no one knew the owner of a second football which was used. The game was played on Sunday of homecoming weekend, October 27, 1974, but not during half time of the varsity football game.

The testimony is undisputed that little instruction in the rules of football was given during the practice sessions. Two witnesses who had played in the game, in addition to the plaintiff, testified that these sessions consisted primarily of passing and hiking the ball and blocking each other in order to get an idea as to which girl was best suited for each position. It was suggested by one of the teachers that the girls purchase mouth guards since tackle football could be "rough" at times. Most of the girls, including the plaintiff, did purchase and wear mouth guards for the game.

The plaintiff testified that several notices of the game were posted on bulletin boards throughout the school. This testimony was corroborated by Reese Hoskins, an assistant principal, and by Rodney Woods, the principal. Additionally, the plaintiff, and two of the participants in the game who testified, stated that at least one, if not more, announcements were made by students over the school's public address system to inform the students of the practice sessions and the game.

Further evidence was adduced at trial by the plaintiff to establish that her injuries were more extensive than a fractured nose. Testimony of a psychiatrist, Dr. Anthony K. Busch, and the result of an electroencephalogram indi-

cating an abnormal brain-wave pattern, were admitted during trial. This evidence related to the testimony given by the plaintiff, her parents, and friends and neighbors of the plaintiff that after the football game in October 1974 the plaintiff's behavior changed. The evidence tended to establish that she became irritable, rebellious and moody. The plaintiff testified that she had six jobs between the time of the accident and the trial, and she was fired from five of them. The plaintiff's parents testified that since the accident the plaintiff had broken windows in her room in a fit of temper; they would find her walking the streets alone at night; and that she would sit in a rocking chair for hours, none of which she had done before her injury. In May 1975, the plaintiff took her father's car and, with another girl and two boys, drove to Colorado and Utah, where they were apprehended by the authorities, but the plaintiff managed to escape. After an accident involving her father's car in Wyoming, the plaintiff was placed in a girls school by the authorities until her parents could travel to Wyoming to take her home with them.

On cross-examination, the plaintiff testified that she had been involved in a fight with another student prior to the football game. Also, the plaintiff testified that her parents began to put more restrictions on her behavior at approximately the same time as the football game.

Dr. Busch testified that he began treating the plaintiff soon after her return from Wyoming. She was placed in the hospital by her parents, where Dr. Busch ordered her to be placed in leather restraints to keep her from running off. Dr. Busch stated that the plaintiff became "more cooperative" after she received sedatives and other medication he prescribed for her which neutralized the effects of her abnormal brain-wave pattern. A second electroencephalogram, taken six months later, showed no appreciable change in the plaintiff's brain-wave pattern.

Dr. Busch stated that in his opinion, based upon a rea-

sonable degree of psychiatric certainty, the plaintiff's condition is of permanent duration, and that while medication would enable her to have better control of her behavior, it would not eliminate her difficulties. Dr. Busch further testified that those difficulties would include impulses that the plaintiff would find difficult to control and some faultiness in judgment. In response to a hypothetical question which recited all of the facts in evidence, Dr. Busch testified that, in his opinion, the injury the plaintiff sustained on October 27, 1974, "quite probably was the causation of her difficulties."

On cross-examination, Dr. Busch testified that his diagnosis of the plaintiff's condition upon her discharge from the hospital was "a behavioral disorder of adolescence." The doctor stated that if an electroencephalogram had been taken before the plaintiff's injury it "would have helped tremendously" in judging whether her abnormal brain-wave pattern existed prior to the accident, but no such test had been conducted. The doctor further testified that he did not think that the plaintiff's abnormal brain-wave pattern existed before the accident because some outward manifestations, including, possibly, fighting, would probably have occurred.

Donald Eugene Arnold, an instructor in football officiating and football coaching at the University of Illinois, also testified. Professor Arnold testified concerning the rules governing high school football in Illinois. He stated that the object is to promote the safety of the players. He further testified that he knew of no organized tackle football games where equipment such as helmets, shoulder pads and the like are not used; that such equipment is required by the rules promulgated by the Illinois High School Association. Professor Arnold further stated that he had coached a powderpuff tackle football game while he was an undergraduate in college. He testified that, in that game, attendance at two weeks' practice prior to the

game was mandatory, and that helmets and full football gear were worn by the participants. Professor Arnold also stated that since head injuries are usually severe, it is mandatory that football players wear helmets for all practices and at all times they are playing football. Finally, Professor Arnold testified that the Illinois High School Association rules provide that a major penalty for roughing the passer after the ball has been released.

Dallas Harrell, an assistant superintendent of the defendant school district, in charge of personnel, was called to testify by the plaintiff as an adverse witness. Harrell testified that he knew the defendant owned the athletic field upon which the football game was played, and he knew that the defendant possessed a duty to supervise the fields and other real property it owned. Harrell was later recalled to the stand as an adverse witness. He stated that the defendant belongs to the Illinois High School Association. On redirect examination, Harrell testified that the defendant follows the rules in regular, authorized games.

During the defendant's case in chief, Rodney Woods, the principal of Collinsville high school, Greenwood campus, testified that the game was not sponsored by the school because the procedure, whereby the board of education approved a faculty sponsor for school activities, was not followed. Woods also stated that, when he was approached by students for permission to make an announcement concerning the game over the public address system, he denied their request because the game was not a school activity. Woods testified that when he was informed that an announcement was made concerning the game, he instructed Reese Hoskins, an assistant principal, to make a countermanding announcement that the game was not an authorized school activity. Reese Hoskins, the assistant principal, subsequently testified that he gave the countermanding announcement. Woods also testified that

pictures of the powderpuff football game were included in the school yearbook, which was produced by the students themselves. Finally, Woods testified very equivocally on cross-examination as to whether he specifically told the students they could not use the athletic field for the game. On cross-examination by plaintiff's counsel the following colloquy occurred:

"Q. Is such a permission request [to use the athletic fields] made then by these people who you say are other than supervisors of a school group?

A. Students ask.

Q. And did you use your discretion and tell them that they couldn't play that game on school property?

A. No.

Q. You didn't tell them they could not play that game?

A. No. They could not play on school property because it was not a school-sponsored activity.

Q. You told these kids that they couldn't play this game on school property, is that correct?

A. Yes. In essence, yes.

Q. And then it was written up in the yearbook and so on. I notice that there is another athletic contest that is written up in the yearbook. A donkey basketball game. In looking at the photos of the donkey basketball game I notice that all of the participants are wearing some kind of helmets, is that correct?

A. I didn't look at that page. You asked me to look at 110.

Q. When you told the students that they couldn't play out there on the Collinsville athletic field, did you tell the teachers as well that they couldn't supervise or that they couldn't coach those students?

A. Tell them they couldn't? One of my assistants told them—

Q. Object to what your assistant said. Did you tell them?

A. Did I tell them? No, I didn't talk to them to the best of my knowledge or recollection."

Linda Mitchell, one of the plaintiff's teachers, testified

that the plaintiff was antagonistic toward her prior to the accident of October 27, 1974, and that plaintiff either failed the first semester or received a grade of D. Also, Mrs. Mitchell testified that the plaintiff's behavior improved toward the end of the year. On cross-examination, the witness indicated that the records from that school year showed that the plaintiff received a grade of C the first semester and a D for the second semester.

Charles Suarez, a Spanish teacher for the defendant and the coach of the junior girls' team for the 1974 game in which the plaintiff was injured, testified that the principal did not instruct him that he could not coach the girls in the game. Suarez also testified that he asked an assistant principal to make an announcement concerning the game, but the assistant principal refused to do so. Suarez stated he did not believe that he undertook to coach the game as part of the activities of the high school, that he received no compensation for coaching the game and that the game was not a part of the regular program of the high school.

Based primarily upon the foregoing facts, the jury returned a general verdict in favor of the plaintiff. It is the jury's function to determine the preponderance of the evidence, and a reviewing court will reverse only if that determination is against the manifest weight of the evidence. (*Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 553; *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 451.) The inquiry on appeal is whether the result reached below was one which is reasonable on the facts in evidence, not whether other conclusions might also have been reached. *Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 575.

At the outset we observe that the parties have not raised or argued the applicability of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, par. 1—101 *et seq.*). We are therefore not called upon to pass on its application to this

case. See *Tanari v. School Directors* (1977), 69 Ill. 2d 630, 634-35.

The defendant school district contends that it has no liability in these circumstances because the powderpuff football game was not authorized or sponsored by the school, and school authorities made an effort to disassociate the school from the game.

The pertinent statute provides:

> "Teachers and other certificated educational employees shall maintain discipline in the schools. In all matters relating to the discipline in and conduct of the schools and the school children, they stand in the relation of parents and guardians to the pupils. This relationship shall extend to all activities connected with the school program and may be exercised at any time for the safety and supervision of the pupils in the absence of their parents or guardians." (Ill. Rev. Stat. 1973, ch. 122, par. 24—24.)

In *Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11, 20, this court said in abolishing school district tort immunity:

> "It is a basic concept underlying the whole law of torts today that liability follows negligence, and that individuals and corporations are responsible for the negligence of their agents and employees acting in the course of their employment. The doctrine of governmental immunity runs directly counter to that basic concept. What reasons, then, are so impelling as to allow a school district, as a quasi-municipal corporation, to commit wrongdoing without any responsibility to its victims, while any individual or private corporation would be called to task in court for such tortious conduct?"

" '[W]here an agent does an act in the course of his employment, although the principal did not authorize or participate in, or know of such misconduct, or even if he forbade the acts or disapproved of them, the rule

of *respondeat superior* applies.' " (*Darner v. Colby* (1941), 375 Ill. 558, 566, quoting *Keedy v. Howe* (1874), 72 Ill. 133, 136; accord, *Singer Manufacturing Co. v. Rahn* (1889), 132 U.S. 518, 522-23, 33 L. Ed. 440, 442, 10 S. Ct. 176, 176; *Richard v. Illinois Bell Telephone Co.* (1978), 66 Ill. App. 3d 825, 845.) We must determine therefore whether the teachers, as agents, were acting within the course of their employment.

Whether an agent was acting in the course of his employment depends upon the contract between the parties and the nature of the relationship. Each case must depend on its own facts. No one feature of the relationship is determinative, but all must be construed together. (*Darner v. Colby* (1941), 375 Ill. 558, 560.) Moreover, the relationship must exist at the time and in respect to the particular transaction out of which an injury arose. (*Mosby v. Kimball* (1931), 345 Ill. 420, 427; accord, *Darner v. Colby* (1941), 375 Ill. 558, 560.) Finally, whether there is express authority is a question of fact, but the existence of implied authority from a certain state of facts is a question of law. (*Doggett v. Greene* (1912), 254 Ill. 134, 139.) It is clear that the teachers were not expressly authorized by the defendant to coach the game; thus whether the teachers possessed implied authority to do so is for the court to determine as a matter of law.

We think the record in this case indicates that at the time of the injury complained of, and during the transaction involved, the teachers were not acting in the course of their employment. The record discloses that the principal ordered that the football game no longer take place during the homecoming games; that the students could not make an announcement concerning the game over the public announcement system; and that the announcement of the game which was given without permission be countermanded to the effect that the game was not an authorized school function or activity. Moreover, Charles Suarez, a

teacher and one of the coaches of the girls' team, testified that he was requested to coach the girls' team by several girls and not by the school board or its representatives. Further, Suarez stated that he never received authority or compensation to coach the team, and that, when he requested permission of an assistant principal to post an announcement concerning the game on a bulletin board, the assistant principal refused to do so. Finally, Suarez testified that he did not believe he was undertaking the game as a part of the activities of the high school nor was the game a part of the regular program of the high school. The existence of an agency relation may be proved by the testimony of the agent concerning the circumstances which constitute his authority. (*Digman v. Johnson* (1960), 18 Ill. 2d 424, 427.) We conclude that under the precise facts of this case, the teachers were acting outside of the course of their employment in coaching the football game, and were thus without express or implied authority to coach the game.

We next inquire whether, since the teachers were acting without express or implied authority, they were acting with apparent authority.

" 'An apparent agent is a person who, whether or not authorized, reasonably appears to third persons, because of the manifestations of another, to be authorized to act as agent for such other.' " (*Alterman v. Lydick* (7th Cir. 1957), 241 F.2d 50, 53, quoting Restatement of Agency sec. 8, comment *a* (1933); accord, *Northern Illinois Coal Corp. v. Cryder* (1935), 361 Ill. 274, 287-88.) A principal is bound equally by the authority which he actually gives his agent and by that which by his own acts he appears to give. (*Faber-Musser Co. v. William E. Dee Clay Manufacturing Co.* (1920), 291 Ill. 240, 244.) In order to hold the principal liable, however, there must be such conduct by the principal that a reasonably prudent person, using diligence and discretion, would naturally suppose an agent to

possess. (*Faber-Musser v. William E. Dee Clay Manufacturing Co.* (1920), 291 Ill. 240, 244; *Alterman v. Lydick* (1957), 241 F.2d 50, 53.) Where evidence is conflicting, the question of whether an agent is authorized to act is a question of fact to be submitted to a jury. *Barkhausen v. Naugher* (1946), 395 Ill. 562, 566; *Freet v. American Electrical Supply Co.* (1913), 257 Ill. 248, 256.

In the instant case, the conflicts in the evidence make this case a close one to decide. It is difficult to determine whether the defendant, by its conduct, would justify a reasonably prudent person, using diligence and discretion, to suppose that the teachers possessed the authority to coach the football game. The principal of the high school, Rodney Woods, and his assistants, did take some steps to disassociate the school from the football game. For example, the fact that they countermanded the unauthorized announcement and refused to post bulletins concerning the game is conduct indicating their intent that the game be considered as an activity unconnected with the school. In addition, two of the girls who had played in the game testified on cross-examination that they did not think they were playing on a team representing Collinsville high school; however, that testimony does not obviate the possibility that the students thought they were engaging in an activity connected with the school program, even though it was not part of an official school team, such as the varsity track or football teams. Moreover, Dallas Harrell, an employee of the defendant, when recalled to the witness stand, testified that, as a matter of policy, approval of the school board is required before the use of defendant-owned athletic fields is permitted, and that teachers have no defined responsibilities beyond their teaching assignments, but that he did not know whether students would know of such matters. Finally, when it is considered that the practice sessions occurred on school grounds immediately after school, that the girls were per-

mitted to use the school locker room to change clothes before practice, that the game took place on the Vandalia campus athletic field owned by the defendant, that the plaintiff and two other student witnesses testified they heard several announcements concerning the game and the practice sessions, and that three teachers were present as coaches and at least one other teacher was present as a spectator, it could appear to a reasonably prudent person that the teachers possessed authority to coach the game. Mindful of all of the evidence in this case, we will not substitute our judgment for that of the jury which heard the testimony and observed the witnesses; "the verdict is not palpably erroneous or wholly unwarranted from the manifest weight of the evidence." *Sloma v. Pfluger* (1970), 125 Ill. App. 2d 347, 359; accord, *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 553.

We note that while the jury was not instructed on the law regarding apparent authority, it was instructed on the law concerning the scope of an agent's authority. Moreover, the plaintiff tendered the following instruction which basically sets forth the law on apparent authority:

> "The court instructs the jury that an agent's authority may be presumed from silence of the alleged principal when he knowingly allows another to act for him as his agent, and the agent's scope of authority may be determined by what persons of reasonable prudence, dealing with the agent, might rightfully believe him to have on the basis of the principal's conduct."

The trial court sustained the defendant's objection to this instruction and refused to give it to the jury. Thus, the defendant cannot contend that error occurred when the jury was not instructed on the law regarding apparent authority, since it was the defendant which prevented the jury from being so instructed. "[A] party waives the right to raise as error action taken by the court at the instance of that party ***." *People v. Spates* (1979), 77 Ill. 2d 193,

199; see *Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 575.

The next issue we consider is whether the general verdict of liability was against the manifest weight of the evidence. Count I of the complaint sounded in ordinary negligence, whereas count II alleged wilful and wanton negligence. The jury returned a general verdict of liability, without distinguishing between the counts. The defendant would be liable under count II only if it, or its agents, had been wilfully and wantonly negligent in failing to supervise the game as an activity connected with the school program. Ill. Rev. Stat. 1973, ch. 122, par. 24—24; *Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165.

We do not think that the facts in evidence support a verdict that the defendant, or its agents, acted in a wilfully and wantonly negligent manner. " 'A wilful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness, or carelessness when it could have been discovered by ordinary care.' " (*Klatt v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 481, 488, quoting *Hering v. Hilton* (1958), 12 Ill. 2d 559, 562, and *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 583.) Furthermore, this court stated in *Myers v. Krajefska* (1956), 8 Ill. 2d 322, 328-29:

"[W]hile it is to be noted that in many instances different wording, language and terminology is employed by the different courts *** [to define wilful and wanton conduct], the basic general concept of the term as applied to the facts in the particular cases has remained essentially the same. The basic element in all of these cases indicates that

liability can be founded under such a cause of action where the act was done with actual intention or with a conscious disregard or indifference for the consequences when the known safety of other persons was involved. The knowledge concerning other persons can be actual or constructive. As indicated by the decisions of other States which do not employ this term, it is generally considered in that area of fault between ordinary negligence and actual malice. In view of the fact that it is a matter of degree a hard and thin line definition should not be attempted. As stated in *Mower v. Williams* [1949], 402 Ill. 486, [489-90], '[a]s to whether or not there has been wilful and wanton conduct in any given case necessitates close scrutiny of the facts as disclosed by the evidence, and while the rule of law does not vary, the facts to which the law is applicable always present divergent circumstances and facts which, in most instances, are wholly dissimilar.' "

See also *Spring v. Toledo, Peoria & Western R.R. Co.* (1977), 69 Ill. 2d 290.

We do not think the teachers' conduct in the instant case rose to the level of wilful and wanton negligence. Certainly, the evidence indicates no intentional act by the teachers. Moreover, the evidence does not establish a conscious or reckless disregard of the safety of the students. Rather, the teachers did conduct several practice sessions, albeit not very efficiently. In addition, the teachers warned the girls that football could be "rough" and advised them to wear mouth guards during the game. The evidence does not demonstrate an utter and conscious disregard for the safety of the girls, simply insufficient precautions for their protection. While it is true that "[w]hen a jury, faced with assessing ordinary negligence or wilful and wanton misconduct, returns a general

verdict, it must be presumed that the defendant has been found guilty of wilful and wanton misconduct (*Trumbo v. Chicago, Burlington & Qunicy R.R. Co.* (1945), 389 Ill. 213, 221; *Greene v. Noonan* (1939), 372 Ill. 286, 291)" (*Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 146-47), where, as here, no wilful or wanton misconduct has been proved as a matter of law and the jury returned a verdict considerably below that requested by the plaintiffs (see *Hering v. Hilton* (1958), 12 Ill. 2d 559, 563, 566-67; *Greene v. Noonan* (1939), 372 Ill. 286, 290; *Brown v. Illinois Terminal Co.* (1925), 319 Ill. 326, 330-31), we think the presumption is sufficiently rebutted. Thus, count II of the complaint merely constitutes an unproved count, the effect of which is governed by section 68(4) of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 68(4)):

> "If several grounds of recovery are pleaded in support of the same demand, whether in the same or different counts, an entire verdict rendered for that demand shall not \*\*\* be set aside or reversed for the reason that the evidence in support of any ground is insufficient to sustain a recovery thereon, unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial."

Formerly the rule which prevailed was that set forth in *Greene v. Noonan* (1939), 372 Ill. 286, 293, wherein it was stated that "where there is no evidence to support [a charge of wilful and wanton misconduct], it is the court's duty, on motion, to withdraw such charge from the jury, and failure to do so is, by reason of the character of the charge, error requiring reversal of the judgment, for no one may know what influence the charge, though not proved, may have had upon the jury, particularly since it has not been informed that it was not to be considered by it. The distinction in law between wilful and wanton conduct and mere negligence is not a

matter with which the average juror is familiar. We are of the opinion that the refusal to withdraw from the jury, on appellants' motion, the consideration of the wilful and wanton charges, requires a retrial of the cause." Pursuant to section 68(4), however, reversal is required only when a motion to withdraw the wilful and wanton misconduct ground on account of insufficient evidence is made prior to the charging of the jury and it *appears* that the denial of the motion was prejudicial. (See Ill. Ann. Stat., ch. 110, par. 68(4), Joint Committee Comments (Smith-Hurd 1968).) That is because the jury is not automatically presumed to have been misled by the court's instructions. Some indication must appear to establish that the jury was improperly influenced by the instructions before reversal will follow.

In the instant case, the defendant made a motion for a directed verdict which contained the following paragraph:

"12. That with regard to Count II, in addition to the facts in evidence stated above, the plaintiff has failed to adduce any testimony from which the jury could conclude that the defendant was guilty of any wilful and wanton misconduct."

Even if we consider, for the sake of argument, that this paragraph is sufficient under section 68(4) (but see *Trumbo v. Chicago, Burlington & Quincy R.R. Co.* (1945), 389 Ill. 213, 219-20; *Smithers v. Henriquez* (1938), 368 Ill. 588, 598; *Burnett v. Caho* (1972), 7 Ill. App. 3d 266, 274), we are unable to say the defendant was prejudiced by its denial. In *Greene* the court based its decision to retry the cause upon the fact that the jury returned a verdict in an amount which was the highest allowable under the Wrongful Death Act. The court reasoned that the jury may have been influenced to do so because of the court's charge of wilful and wanton misconduct. In this case, the plaintiff requested, as to Cynthia, a verdict

of $100,000, and a verdict of $5,000 to compensate Raymond Lynch. The jury returned a verdict in favor of Cynthia for $60,000 and denied any recovery to Raymond.

On the facts of the case before us, we are unable to perceive any prejudice to the defendant. Finally, had this defendant desired to ascertain upon which count or counts the jury returned its verdict, it could have done so by requesting a separate verdict upon each demand. (Ill. Rev. Stat. 1973, ch. 110, par. 68(3).) Since the defendant did not do so, it cannot complain or seek to take advantage of its failure. *Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 294; *Smithers v. Henriquez* (1938), 368 Ill. 588, 598; *Stark v. D & F Paving Co.* (1977), 55 Ill. App. 3d 921, 928.

Our holding that there was insufficient evidence of wilful and wanton negligence as a matter of law (see *Mower v. Williams* (1949), 402 Ill. 486) makes it necessary to decide whether there was sufficient evidence to justify a verdict that the defendant was ordinarily negligent. Count I of the complaint alleged that the defendant was liable to the plaintiff, pursuant to *Gerrity v. Beatty* (1978), 71 Ill. 2d 47, since the defendant failed to provide effective equipment to the students. In *Gerrity,* the 15-year-old plaintiff suffered severe injuries while making a tackle in a junior-varsity football game. He alleged in one count of his complaint that the defendant school district was negligent in furnishing him with an ill-fitting and inadequate helmet. We held there that sections 24—24 and 34—84a of the School Code (Ill. Rev. Stat. 1973, ch. 122, pars. 24—24, 34—84a, applicable to cities with populations of less than 500,000 and cities with populations greater than 500,000, respectively), which bestow limited immunity upon teachers in the exercise of disciplinary or supervisory duties, do not apply to the furnishing of equipment to students. (71 Ill. 2d 47, 52-53.) Thus, we held

that rather than prove that a teacher was wilfully and wantonly negligent in a matter relating to the teacher's personal supervision and control of the conduct or physical movement of a student, under the rule in *Gerrity* a plaintiff need only prove that a school district was ordinarily negligent in furnishing equipment.

In *Thomas v. Chicago Board of Education* (1979), 77 Ill. 2d 165, this court considered whether individual teachers were liable in ordinary negligence for the failure to provide effective equipment. Based in part on the policy of not encouraging litigation between teachers and students, we held that since the school districts *furnish* equipment, whereas teachers *inspect* equipment, which is more properly a supervisory function, individual teachers would not be liable for ordinary negligence, but only for wilful and wanton negligence in failing to inspect equipment.

In the instant case, the school district alone is the defendant. Thus, the inquiry need only be whether the jury was justified in finding the defendant school district negligent in failing to provide effective equipment to the student. The defendant argues that it cannot be liable, because the game was not authorized, and because it did not furnish any equipment, so it could not have furnished defective equipment. We have previously decided that the teachers were acting with apparent authority; thus, whether the game was authorized is not material. We also do not think that, because the defendant did not furnish any equipment to the students, it is absolved from liability for failing to provide effective equipment. Instead, we think a school district has an affirmative duty, where students are engaging in school activities, whether they are extracurricular, or formally authorized as part of the school program, to furnish equipment to prevent serious injuries. At the least, a school district should furnish helmets and face guards for a game such as football, where

head injuries are common and severe. Accordingly, we think the instant school district was negligent for failing to provide, at the least, helmets and face guards to the students. It is reasonably clear that the manifest weight of the evidence established negligence on the part of the defendant because it did not furnish any protective head gear or face gear to the students although it knew or should have known through its agents that an injury was foreseeable. Moreover, the failure to provide such equipment was a proximate cause of the plaintiff's injury.

If we were not to hold the defendant liable for failure to furnish any equipment, a school district could easily escape liability simply by not furnishing any equipment to students, thereby forcing students to purchase equipment themselves. In that way, only students who could afford their own equipment would be able to engage in school-connected sports activities. We are unwilling to encourage such a result. The jury's verdict will stand.

Another contention made by the defendant is that the trial court committed reversible error when it instructed the jury as follows:

> "There was in force and effect in the State of Illinois at the time of the occurrence complained of a certain statute which provided that: the school board of any school district acquiring real estate and equipping, operating and maintaining it for the purposes provided, shall have supervision over athletic fields, and may employ play leaders, playground directors, supervisors, recreational superintendents, or athletic directors thereof, and may take such steps to provide for the protection thereof as it deems appropriate."

This instruction was given over the objection of the defendant. It is adapted from Illinois Pattern Jury Instructions, Civil, No. 60.01 (2d ed. 1971), and is based on section 16—8 of the School Code (Ill. Rev. Stat. 1973, ch. 122, par. 16—8), which provides in pertinent part:

> "The school board of any such school district acquiring

> real estate and equipping, operating and maintaining it for the purposes provided in Section 16—7 shall have supervision over such playgrounds, recreation grounds or athletic fields, may employ play leaders, playground directors, supervisors, recreation superintendents or athletic directors therefor, and may take such steps to provide for the protection, sanitation, care and management thereof as it deems appropriate."

First of all, "Illinois law is clear that 'the violation of a statute or ordinance designed for the protection of human life or property is *prima facie* evidence of negligence.' (*Dini v. Naiditch* (1960), 20 Ill. 2d 406, 417.) *** The party requesting instruction No. 60.01 [Illinois Pattern Jury Instructions, Civil, No. 60.01 (2d ed. 1971), the same instruction involved herein] must also demonstrate that the statute or ordinance was intended to protect against the injury incurred, and that the injured party is within the class intended to be protected. [Citations.]" (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 390.) The plaintiff introduced evidence that the defendant owned the athletic field property and understood it had a duty to supervise the field, presumably for the protection of students while engaged in school activities. The duty imposed on school boards by section 16—8 is a supervisory duty; thus, we assume, without deciding, that, in order to recover under the statute for the acts of teachers, a plaintiff would need to establish wilful and wanton negligence. We have held, however, that no wilful and wanton negligence occurred in this case. Therefore, the defendant's objection should have been sustained and the court should have refused to give the instruction. The defendant, however, makes the conclusional statement that the court's delivery of the instruction "seriously prejudiced" the defendant's case by erroneously informing the jury that the defendant had a duty which was not charged by statute or judicial decision. We do not agree that the defendant was seriously prejudiced for this reason and,

in the absence of argument concerning other grounds of prejudice, we think the defendant's assertion lacks merit.

Finally, the defendant argues that the jury's verdict of $60,000 was excessive. The amount of a jury's verdict will stand unless it is so large as to indicate passion or prejudice. (*Baird v. Chicago Burlington & Quincy R.R. Co.* (1976), 63 Ill. 2d 463, 473; *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 453.) Based on the evidence that the plaintiff suffered a fractured nose, underwent psychiatric treatment, and suffered, in Dr. Busch's expert opinion, permanent brain damage, we do not think the verdict was excessive.

Accordingly, for the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

MR. CHIEF JUSTICE GOLDENHERSH, concurring in the decision:

I agree with the appellate court that on this record the judgment should be affirmed. As noted by the appellate court, instructions adapted from Illinois Pattern Jury Instructions, Civil, No. 50.04 and No. 50.06 (2d ed. 1971), were given without objection from the defendant. (See 72 Ill. App. 3d 317, 322.) In order to return a general verdict in favor of the plaintiff the jury was required to determine that at the time of the occurrence defendant's employees were acting within the scope of their authority. The evidence was conflicting and there was enough evidence to support the jury's verdict.

MR. JUSTICE MORAN, concurring in the decision:

Generally, a school district should not be held liable for all activities that may take place on its premises. Under the facts of this case, however, it is clear that the powder puff football game had, as pointed out in the dissent, "formerly been a part of the school program." It is my

opinion that the district, through its principal, was, in light of such precedent, required to take more consistent and positive action to overcome implied acquiescence and thereby absolve itself from liability.

MR. JUSTICE RYAN, dissenting:

The court's opinion in this case leaves me with the distinct impression that it strains to reach a desired result. Furthermore, I cannot understand the reason for the lengthy discussion concerning agency in this opinion because the cause of action against the school district is not based upon any act or conduct of the agents. The opinion, after ruling out the possibility that the teachers were acting within their expressed or implied authority, concludes that the jury may have found that the teachers had been clothed with an apparent agency. Even if the teachers who coached the football teams were clothed with an apparent agency, this would not render the district liable because the cause of action is not based on any injury brought about by reliance on the apparent authority of the agents. Count I of the complaint, which the opinion holds supports the verdict, charges the school district with negligence in failing to provide effective protective equipment to the participants in the football game, which, of course, has nothing to do with the agency of the teachers who were the coaches. I find the entire agency discussion irrelevant.

It may be that my colleagues felt it necessary to establish the agency of the teachers in order to prove that the football game was a school function; however, it is not necessary to get involved in this circuitous reasoning. Whatever evidence there may have been to prove agency would be evidence that the football game was a school activity: The practice sessions and the games were played on school property; three teachers were present as coaches; and announcements concerning the

games and practice sessions were made on the school public address system. The reasoning of the opinion therefore seems to be: the teachers were apparent agents of the school district because the activity had the appearance of a school function and the activity was a school function because the teachers were the apparent agents of the school district. Therefore, this reasoning would conclude, the defendant school district had the obligation to furnish effective protective equipment.

Although the discussion of apparent agency is irrelevant, since the opinion has placed substantial reliance on this principle, I wish to comment briefly on its application to the law of torts. Usually the doctrine is applied to bind the principal on a contract made by an apparent agent while acting within the scope of the apparent authority with which the principal has clothed him. (See Restatement (Second) of Agency secs. 8, 27 (1958).) In fact, all of the cases cited in the opinion on this point are contract cases, and none are cases where a principal is sought to be held for the tortious act of an apparent agent. Rarely is a principal held responsible for the tortious act of one who is only an apparent agent. Some cases have held a principal responsible for the tortious acts of an agent acting within the "apparent scope of his authority." The holdings of these cases do not usually mean that the master can be charged with the negligence of his servant on the mere strength of an appearance of being about his master's work. In these cases it seems obvious that the employer's liability was determined according to whether the matters complained of occurred within the general scope of the servant's employment and not within the scope of an apparent agency. See Annot., 2 A.L.R.2d 406, 413 (1948). See also W. Seavey, Law of Agency sec. 8, at 13 (1964).

Moving next to the reasons I believe the judgment for the plaintiff must be reversed, I will first address the

giving of a clearly erroneous instruction. The opinion acknowledges that the giving of plaintiff's instruction based on section 16—8 of the School Code (Ill. Rev. Stat. 1973, ch. 122, par. 16—8) was error, but found that the defendant was not "seriously prejudiced" and refused to reverse and remand for a new trial. (82 Ill. 2d at 436.) However, earlier the opinion states: "[T]he *conflicts in the evidence* make this case a *close one to decide.*" (Emphasis added.) (82 Ill. 2d at 427.) The cases are legion which hold that where the case is a close one on the facts and a decision must depend upon conflicting testimony, the jury should be accurately instructed. *Both v. Nelson* (1964), 31 Ill. 2d 511; *Edwards v. Hill-Thomas Lime & Cement Co.* (1941), 378 Ill. 180; *Anlicker v. Brethorst* (1928), 329 Ill. 11; *Baddeley v. Watkins* (1920), 293 Ill. 394; *Chicago, Burlington & Quincy R.R. Co. v. Warner* (1884), 108 Ill. 538.

I also note that the instruction was erroneous not only for the reason stated by the majority opinion, but because it in essence instructed the jury that the school district had a duty to supervise athletic fields and to employ recreational superintendents and athletic directors. Although the cause of action under count I was not based on the failure of the district to supervise the activities on the school's playgrounds, the giving of this instruction setting forth substantially the provisions of section 16—8 informed the jury of a supposed statutory duty. The instruction is adapted from Illinois Pattern Jury Instructions, Civil, No. 60.01 (2d ed. 1971). However, that part of IPI Civil No. 60.01 which informs the jury that if it decides that the defendant violated the statute on the occasion in question, then it may consider that fact together with all the other facts in evidence in determining whether the defendant was negligent, *was not given.* Thus, this was not an IPI instruction modified. It was an incorrect, misleading, abstract statement of law that has no

application to the liability of the school district in this case. An instruction on a statutory duty may be given only when the injury has a direct and proximate connection with the violation of the statute. (*Brunnworth v. Kerens Coal Co.* (1913), 260 Ill. 202, 216-17; *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 79.) Also, the giving of instructions which are nothing more than abstract statements of law, without connecting them with the issues of the case, has been condemned. (*Gillette v. City of Chicago* (1947), 396 Ill. 619; *Dursch v. Fair* (1965), 61 Ill. App. 2d 273; *Sarelas v. Meyer* (1943), 317 Ill. App. 382 (abstract of opinion).) As noted below, section 16—8 of the School Code imposes no duties on the board. The giving of this abstract statement in the form of an instruction to the jury as to the law of the case could only mislead the jury and cause it to believe that the failure of the school to properly supervise the football games was somehow important to its liability. As noted above, the courts of this State have many times held that where the case is a close one on the facts and the decision must depend upon conflicting testimony, the jury should be accurately instructed.

I also point out that the opinion mistakenly states that section 16—8 imposes a "supervisory duty" on the school district. This section of the School Code does not impose a duty upon the school district to do anything. Instead, this section of the School Code grants to the school board certain authority that it may exercise over playgrounds, recreation grounds and athletic fields which the district has acquired. Since the school district is a creature of the legislature, it and its governing board have only the authority granted to it by the legislature or necessarily implied therefrom. It was therefore necessary that such a grant of authority as contained in section 16—8 be given to the school board before it could perform the functions specified in that section. By conferring this

authority it clearly was not the intention of the legislature to require every school district that has "playgrounds, recreation grounds and athletic fields" to provide constant supervision over these facilities and to employ play leaders, playground directors, recreation superintendents or athletic directors therefor.

Finally, this football game was plainly not a school activity for which the district had a duty to furnish protective equipment. Although formerly part of the school program, the game had been discontinued as such and was no longer permitted to be played in conjunction with a regular school athletic event. It was not authorized by the school board or the principal, and requested sponsorship by the school board had been denied. Both the practice sessions and the game were held other than during school hours. The teachers who coached the teams were not paid to do so and were not performing any of their school duties. When unauthorized announcements of the game were made on the school's public address system, they were countermanded. In fact the school did everything possible to disassociate itself from this activity short of prohibiting the teachers from coaching the teams and prohibiting the use of the athletic field for the contest. Whether the school board could prohibit a teacher from such activity on a Sunday afternoon is doubtful, both as to its authority to do so and the effectiveness of such an order if given. As for prohibiting the use of the athletic field, the failure to do so cannot be the basis for imposing liability upon the district. There are hundreds of school playgrounds, recreation grounds and athletic fields in this State that are used virtually every Sunday afternoon by groups of students engaging in athletic contests, often using inadequate and makeshift equipment. These school facilities are public grounds, paid for and maintained with public funds. The people in most communities have come to believe that they have a right to use them, particularly

on the days that school is not in session. It would be difficult to prohibit the use of these facilities short of building a chain-link fence around them and locking the gate.

It is easy to say that we have here a question of fact for the jury to determine; however, we cannot so easily abrogate our judicial duties and permit a sympathetic jury to speculate that the teachers were the apparent agents of the school district. The question here is one of duty, which is a question of law. I would hold that, under the facts of this case, the school district was under no duty to provide protective equipment for the football game. This is the issue in this case, not whether the teachers were the apparent agents of the school district, which the opinion states is a question of fact. As noted above, the cause of action is not based on any conduct of the alleged agents. To permit the plaintiff in this case to recover will only cause school districts to restrict the use of school facilities to the detriment of the vast numbers of students who use them for Sunday afternoon recreation. I would reverse the judgment in favor of the plaintiff.

UNDERWOOD and WARD, JJ., join in this dissent.