2025 IL App (1st) 231708-U

No. 1-23-1708

First Division
December 22, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| CHRISTOPHER BASKEN, | ) | Appeal from the |
| As Father and Next Friend | ) | Circuit Court of |
| Of Eugene BASKEN, a minor, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | No. 19 L 012690 |
| v. | ) | |
| | ) | |
| SAMUEL GUILLERMO CORDERO- | ) | Honorable |
| DENNIS and GREENFIELDS ACADEMY, | ) | Christopher E. Lawler, |
| INC., | ) | Daniel A. Trevino, |
| | ) | Anthony Swanagan, |
| Defendants-Appellees. | ) | Judges, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The circuit court's judgment is affirmed where it properly granted defendant's motion to dismiss and motion for summary judgment.

¶ 2   This action stems from an automobile accident in which Eugene Basken (Eugene), a student at defendant-appellee Greenfields Academy, Inc., was struck by a car driven by a formerly

named defendant in this case, Samuel Guillermo Cordero-Dennis.[1] Plaintiff-appellant, Christopher Basken, as father and next friend of Eugene, a minor, now appeals from the circuit court's orders granting defendant's motion to dismiss the negligence claims in plaintiff's fifth amended complaint (5AC) pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2020)) and granting defendant's motion for summary judgment as to the willful and wanton misconduct claims of the 5AC pursuant to section 2-1005(c) of the Code (735 ILCS 2-1005(c) (West 2020)). On appeal, plaintiff argues that (1) the circuit court erred in dismissing the negligence counts and finding that defendant was immune under section 34-84a of the Illinois School Code (School Code) (105 ILCS 5/34-84a (West 2020)), and (2) the circuit court erred in granting summary judgment where there was evidence in the record demonstrating that defendant acted with utter indifference or conscious disregard for students' safety through its street-crossing policy. For the reasons that follow, we affirm.

¶ 3                                        I. BACKGROUND

¶ 4      The following factual summary is derived from the pleadings contained in the record.

¶ 5      From 2014 to 2022, Greenfields Academy, a private school, functioned as an academic center for children ranging from age five to eighteen. The students were grouped together by "competency-based" bands and led in classroom curriculum by individuals referred to as "guides."

¶ 6      Greenfields stands directly across Elston Avenue from Brands Park, a public park operated by the Chicago Park District. Students enrolled at the school regularly used Brands Park for outdoor recreational periods both during regular school hours and as part of the after-school program. To reach the park, students cross Elston Avenue at its intersection with Francisco

---

[1] The claims against Cordero-Denis were settled in 2023, and he is not a party to this appeal.

Avenue, which terminates at Elston and forms a three-way intersection. Stop signs at Elston control Francisco Avenue, while traffic along Elston is not stop-controlled. The intersection contains marked crosswalks on both the north and south sides and is identified by large yellow pedestrian signs.

¶ 7                                                    A. Complaint

¶ 8     On November 18, 2019, plaintiff filed his initial complaint against Cordero-Denis, asserting claims of negligence and willful and wanton misconduct.[2] Several months later, he filed a first amended complaint adding Greenfields Academy as a defendant, asserting vicarious liability for Emily Heck's alleged negligent supervision of the students. Over the next three years, plaintiff filed multiple amended complaints, refining his claims as to Greenfields Academy.

¶ 9     On July 7, 2021, plaintiff filed the operative eight-count complaint. Counts V and VI, asserting claims of negligence, alleged the following. Greenfields Academy, Inc., owned and operated a school located on Elston Avenue in Chicago and Eugene Basken was enrolled as a student there. Elston Avenue was a "major thoroughfare heavily traveled by motor vehicles traveling at high rates of speed" and Greenfields' employees knew that the Elston-Francisco crosswalk was dangerous. Greenfields "did not provide any type of safety equipment to its employees" to ensure the safety of its students crossing a busy roadway.

¶ 10    Further, the complaint alleged that on or before November 6, 2019, Emily Heck was a duly authorized "agent and/or employee" of Greenfields and that Eugene was "under the supervision, care and control of employees." The complaint also alleged that Heck, while acting as an agent/employee of Greenfields, "was supervising children including Eugene Basken, while

---

[2] Counts I, II, III, and IV, which allege negligence and willful and wanton conduct against Cordero-Denis, are not relevant to this appeal.

wearing all-black clothing" as they were crossing Elston Avenue at approximately 4:44 p.m. Additionally, the complaint alleged that Heck, while acting as a duly authorized agent and/or employee of Greenfields, directed the children to cross Elston Avenue "while her back was to oncoming motorist when it was not safe to do so" and also that Heck did not properly monitor the children as they were crossing Elston Avenue.

¶ 11    Finally, the complaint, in count V, alleged that Greenfields "owed a duty of ordinary care in ensuring that children could safely cross the roadway" and that it was negligent and breached its duty of ordinary care by (1) maintaining a policy which permitted only one employee to monitor children while crossing a busy roadway; (2) failing to have more than one employee monitoring children while they were crossing the roadway; and (3) and "failing to provide adequate safety equipment to ensure the safety of its students crossing a busy roadway." Count VI set forth the same allegations as claims under the Family Expense Act (750 ILCS 65/15 (West 2020)).

¶ 12    Counts VII and VIII re-alleged the same conduct as alleged in counts V and VI but were couched as willful and wanton conduct. Specifically, plaintiff additionally alleged that Greenfields, "by and through its duly authorized agent and/or employee, Emily Heck, exhibited conscious disregard or utter disrespect for the safety of others[,]" consciously disregarding public safety by: (1) "allowing children to cross the roadway knowing it was unsafe"; (2) "carelessly directing children to cross the roadway when traffic had not stopped"; (3) "walking children into the roadway when traffic had not stopped"; (4) "allowing children to cross the roadway when traffic was not stopped"; (5) "failing to monitor children while there were crossing the roadway"; (6) "failing to provide adequate safety equipment to ensure the safety of its students crossing a busy roadway"; (7) "failing to monitor traffic while the children were crossing the roadway"; and (8) "failing to have more than one employee monitoring children while they were crossing the

roadway[.]" Count VIII set forth the same allegations as claims under the Family Expense Act (750 ILCS 65/15 (West 2020)).

¶ 13                                 B. Motion to Dismiss Counts V and VI

¶ 14    On September 28, 2021, Greenfields filed a motion to dismiss the negligence counts under section 2-619 of the Code. In the motion, Greenfields argued that plaintiff's claims relate to negligent supervision. According to Greenfields, pursuant to section 34-84a of the School Code (105 ILCS 5/34-84a (West 2020)), it was immune from ordinary negligence claims arising from supervision. On November 2, 2021, plaintiff filed his response. Therein, plaintiff argued that he had alleged independent negligence on the part of Greenfields for failing to have an appropriate safety policy for students crossing busy city streets and for failing to supply its employees with safety equipment that would make them visible when leading students across Elston Avenue, a known busy street. Plaintiff asserted that, "[w]hen the complaint alleges the independent negligence of the school district rather than liability through the acts of a teacher, the defendant school district is not entitled to vicarious immunity." On January 3, 2022, the circuit court granted Greenfields' motion and dismissed the negligence counts with prejudice. In doing so, the court found that plaintiff's claims, although framed as direct negligence, arose out of Heck's supervision and control of students and were therefore barred under section 34-84a of the School Code.

¶ 15                                 C. Discovery

¶ 16    Following dismissal of counts V and VI of the complaint, the parties engaged in discovery. The following summarizes the exhibits, largely comprised of deposition testimony, produced during discovery.[3]

---

[3] The discovery depositions of the witnesses were taken via Zoom and videotaped.

¶ 17                                    1. Mark Robert Huge

¶ 18    Huge testified that, in November 2019, he was the founder and president of Greenfields Academy, the last day of operation of which was July 2022. In identifying a location for the school, Huge was "committed to trying to keep tuition down" and looked for a location "near public green spaces" so that the school could utilize "outside space" without adding to the school's footprint. One of the factors which appealed to Huge about the 3232 Elston Avenue location was its proximity to Brands Park. At the time the school was located next to Elston Avenue, Huge did not look into anything relating to traffic but spent time during the different times of day "when kids would be there, drop off, pick up, crossing-the-street time, for outside time, just to see what the traffic was like and what it would be like to use Brands Park as our green space." The school served students ranging in age from 5 to 18 years, grouped into three multi-age learning cohorts of approximately 10 to 15 students, each led by two teachers, referred to as "guides."

¶ 19    Huge testified that Heck, whom he hired, was not a full-time employee of Greenfields. Her primary role was working with the after-school program. Weather permitting, the students would utilize Brands Park every day. Resources provided to Heck included a "handheld stop sign and the first aid backpack," also referred to as an "emergency bag." He believed that there was a whistle in the emergency pack, but Heck was not required to utilize it while escorting kids to the park. No reflective vests were provided as Heck would only be doing her work during daylight. Neither did the school use tethers, leashes, hand holds, or rings. Huge further testified that he did not believe reflective vests would have been helpful during Greenfields' after-school program during normal daylight hours.

¶ 20    Huge stated that on the day of the accident, when he arrived at the school, "it had just begun to get darker." Eugene's accident was the only pedestrian strike about which Huge was aware.

¶ 21                                2. Emily Heck

¶ 22    Heck testified that she has a master's degree in early childhood education and a teaching certification through the State of Illinois. She began working part-time as a guide for Greenfields' after-school program in August 2019 and continued to work there through the end of the 2020 school year. Her responsibilities included supervising indoor and outdoor activities and escorting students to and from Brands Park. Regarding orientation, she recalled coming into Greenfields for a day and meeting with Aimee Skinner and Maggie Baker to go over their employee handbook and procedures. She was "given a tour of the school where [she] would be accessing the tools [she] would need to run the after-school program." With respect to health and safety, she was walked through a procedure for crossing the street.

¶ 23    Specifically, she testified that they would cross at the intersection closest to the school, which was close to the school's entrance on Elston. They had a big reflective red stop sign, which would be carried into the intersection by the guide helping the kids cross the street. According to Heck, "you do a preliminary check to make sure it's safe for you to enter the crosswalk[.]" She would enter the crosswalk with the red sign, check the traffic from both directions, and once the crosswalk was secured, then she would indicate that children were able to cross. While engaged in the different steps of that process, the children would be waiting at the crosswalk before they crossed the street and on the sidewalk. No one would be standing with the children while she entered the crosswalk.

¶ 24    On the afternoon of the accident, there were six to eight children with her, the youngest of which was 5 years old and the oldest being 13 years old. Other than "going into the crosswalk, holding up the stop sign, waiting, like, securing the crosswalk," Heck recalled no other procedures which dealt with children crossing Elston. There was another individual designated to work as a guide with Heck after school each day, but that person never accompanied her to the park with the children.

¶ 25    Heck recalled that the accident involving Eugene occurred at around 4:30 p.m., that it was a clear day and that it had not yet become dark. On that date, she "entered the crosswalk with the stop sign raised above [her] head; "walked probably roughly to the middle of the crosswalk"; checked the traffic heading southwest down Elston and checked the traffic heading "northwest and southeast." She recalled "seeing a car stopped heading in the northwest-heading direction." She "was checking the southwest-heading direction." "Eugene was the first to run out into the street into the crosswalk, and that's when he made contact with the car that went through the crosswalk," heading in the "southeast direction." None of the other children had entered the crosswalk because she "hadn't indicated that the crosswalk was secure for them to cross." At the time Eugene entered the crosswalk, she was still in the process of securing the crosswalk.

¶ 26    On the date of the accident, she was wearing a blue down coat and long pants and was carrying a backpack. Greenfields had never offered her a reflective vest, a whistle, a flashlight, or a tether. Had they done so, she would have utilized them. Prior to the November incident, she had no concerns while crossing Elston and Francisco. Heck recalled that Eugene suffered a head injury and broken leg because of the accident. Upon his return to school, she did not recall any differences in his behavior or abilities, other than needing a walker because of his broken leg.

¶ 27                                    3. Manuel Flores

¶ 28    Flores testified that he witnessed the "crash" on Elston on November 6, 2019. He described that, at the time of the incident, it was daylight, and the day was clear and sunny. As he was driving, he saw a lady to his right with a stop sign and he then "hit [his] brake" and stopped. What made him stop was "her and that stop sign." When he first saw the lady, she was on the right-hand side of the road. Once the lady pulled out the sign and saw that he had stopped, she walked in front of his vehicle. As she was walking in front of his vehicle he observed "the kid dart out." Flores stated that "[t]he kid seemed like he was in more in the back, not the first person" and "as they start walking, meaning the other kids, he just runs out front," and Flores saw "him get hit by the car going the other way."

¶ 29                                  4. Samuel Cordero[4]

¶ 30    Cordero testified with the aid of an interpreter. His testimony is somewhat difficult to follow.[5] Cordero testified that on November 6, 2019, between 3:30 and 4:00 p.m. he was headed home. Prior to the accident, he was watching a car in front of him. The car in front never stopped at the crosswalk prior to Cordero striking the child. When Cordero first noticed the child, he was running. At the time, the "teacher" was preparing the children to cross, but "this particular child escaped and he took off running." He described the impact as being "more or less" on the "back door by the driver." He testified that at no time did the child come into contact with the front of his car. He saw the child running and he "tripped with [Cordero's] car." He repeatedly testified that he did not see the "teacher" as he was paying attention to the car in front of him.

_____

[4] Although named in the complaint as Samuel Guillermo Cordero-Denis, Cordero-Denis is identified in his deposition as Samuel Cordero.

[5] Late in the deposition, Cordero affirmed that someone was in the room with him, prompting defendant's counsel, over  plaintiff's counsel's objection, to indicate his intent to re-depose Cordero in person. No additional (in-person) deposition transcript for Cordero appears in the record.

¶ 31                                    4. Aimee Skinner

¶ 32      Skinner testified that she was contacted by Huge about a position at Greenfields Academy while it was still in "launch phase." Just prior to starting at Greenfields, she worked as a school administrator for four years in Chicago and was familiar with what administration entailed. She was never hired as a full-time employee of Greenfields but worked as a contractor. Sometime after working with Greenfields, she gave herself the business name of Skinner Solutions. For the first 6 to 12 months of her time with Greenfields, she helped with admission, recruiting employees, and marketing. Although she was involved in the search to identify potential locations for Greenfields, Huge led the effort and made the final decision concerning the location. She raised no concern regarding the location.

¶ 33      Skinner had no specific recollection of being involved in the hiring of Heck. She had no specific recollection as to whether policies, procedures, or guidelines related to student safety were sourced from outside entities or organizations. Orientation and training would be provided to new employees, depending on the specific hire.

¶ 34      In the past, Skinner would substitute for an absent guide and in that capacity would have accompanied the group of children to Brands Park. During the midday hours, when this outdoor time would occur, there would typically be two guides to accompany the children because it would be a large group. For the after-school program at Brands Park, there would typically be one guide that would accompany the children because it was a small group. She recalled that Heck would have been told the procedure for crossing to Brands Park either by Huge or another person. Heck would have been provided with the handheld stop sign, the first aid backpack, and could have been required to have a phone with her in case of emergencies. After-school program guides were not required to wear reflective vests, and she did not recall any sort of ring, tethers, or leads to be

utilized by the guides when escorting children across the street for the after-school program. She testified that she did not believe that there was a written safety policy, only a procedure for guides to cross the students to the park.

¶ 35    Skinner was notified by a parent of a student at Greenfields of the accident involving Eugene and arrived shortly after, accompanying Eugene in an ambulance to the hospital. Eugene suffered serious injuries, including a fractured ankle and a traumatic brain injury. Skinner completed an incident report the next day.

¶ 36                                   D. Motion for Summary Judgment

¶ 37    Following discovery, on November 30, 2022, Greenfields filed a motion for summary judgment as to counts VII and VIII, asserting that no evidence supported a finding of willful and wanton misconduct.

¶ 38    Specifically, Greenfields argued that it had considered student safety when selecting its location, had developed and trained staff in a crossing protocol, and had provided appropriate equipment, *i.e.*, a handheld stop sign, which amounted to a conscious regard for its students' safety. Greenfields asserted that, as a result of this evidence, plaintiff was unable to establish that Greenfields exhibited an utter indifference to safety or consciously disregarded safety because the intersection had no history of student injuries, and all deponents agreed the crossing occurred in the daylight. Attached as exhibits to the motion were, *inter alia*, the transcripts of the discovery depositions of Huge, Heck, Flores, and Cordero.

¶ 39    Additionally attached was a copy of a December 9, 2019, letter addressed to Alderman Rodriques-Sanchez from the Chicago Department of Transportation (CDOT) in response to a traffic study request of North Elston Avenue and North Francisco Avenue. The letter indicated that Elston Avenue runs northwest to southeast and provides for one lane of traffic in each

direction, with on-street parking permitted on both sides. Elston Avenue is a "collector" street used by approximately 16,600 vehicles per day. Prior to December 2019, CDOT data documented four collisions at the Elston and Francisco intersection, two of which involved pedestrians. Further, the letter stated that the overall crash history is relatively low for an intersection like Elston and Francisco and there did not appear to be any significant trends among the crash data.

¶ 40 On January 18, 2023, plaintiff filed a response, asserting that Greenfields engaged in willful and wanton conduct and consciously disregarded Eugene's safety by failing: (1) to provide two adult guides to escort the students in the after-school program, (2) to provide the after-school program guide with proper safety equipment to escort students across Elston Avenue, and (3) to maintain a written safety plan for escorting students to Brands Park. Plaintiff asserted that Greenfields' conduct exhibited an utter indifference to the safety of its students or consciously disregarded Eugene's safety. Attached as exhibits to the response were, *inter alia*, a copy of the crash report, a copy of the Adult School Crossing Guard Guidelines (ASCGG), the Sunrise Table for 2019, as well as the discovery deposition transcripts of Huge, Skinner, Heck, Flores, and Cordero. Also attached was an affidavit of plaintiff's expert, Ronald Bolandi, which was subsequently amended by plaintiff on January 27, 2023.

¶ 41 Relevant here, the ASCGG were prepared by "the National Center for Safe Routes to School and the Pedestrian and Bicycle Information Center, both part of the University of North Carolina Highway Safety Research Center, with funding from the National Highway Traffic Safety Administration." The guidelines recommend that "[w]ide streets with multiple lanes of traffic typically require the use of two or more adult school crossing guards." Additionally, the guidelines recommend that "[a]n adult school crossing guard wears a uniform and uses equipment that is highly visible and easily identifiable by the general public." We note that these guidelines were

reviewed and referred to in Bolandi's affidavit, although he refers to them as "NCSR Crossing Guard Guidelines."

¶ 42    In the amended affidavit, Bolandi averred that he has worked as a superintendent of schools for multiple school districts throughout New Jersey and has over 40 years' experience. One of his responsibilities was to develop and implement safety plans for schools and students, specifically plans for crossing school children in public roadways to and from school property. He opined that Greenfields failed to meet its duties to Eugene and willfully disregarded "recognized standards of care for crossing school aged children on busy roadways on November 6, 2019." First, Greenfields "consciously disregarded the safety of its students *** by failing to provide two adult guides" for the after-school program to accompany the children back and forth from Brands Park, across Elston Avenue. Second, Greenfields and its employee Heck willfully disregarded best practices and guidelines for adult guides by failing to utilize recognized safety equipment while crossing the students at the intersection of Elston and Francisco. Third, November 3, 2019, was the day that daylight saving time ended in 2019, and thus, "sunset and dusk [were] likely underway at the time of the November 6, 2019 crash based on the time documented on the Illinois Traffic Crash Report." Finally, Greenfields "consciously disregarded the safety of its students by not having a written safety plan in place for crossing its students" at the Elston and Francisco intersection.

¶ 43    On March 8, 2023, Greenfields filed a reply, arguing that the presence of one teacher crossing the street is not evidence of a conscious disregard of safety, it provided the guide with safety equipment demonstrating a conscious consideration of safety, and it had a known and recognized procedure for crossing the street with its students. Greenfields further contended that Bolandi's opinion does not create a question of fact because the evidence established that it

consciously considered the safety of its students and took multiple steps to mitigate the risk of an "ordinary, everyday activity."

¶ 44 Notably, following plaintiff's submission of Bolandi's affidavit, Greenfields deposed him. In that deposition, Bolandi agreed that Greenfields did provide some safety precautions, such as the handheld stop sign, and some training in its street-crossing procedures, but he nonetheless testified that the training was not adequate and Heck should have been wearing a reflective vest or lighter clothing. He further agreed that the depositions of Huge, Skinner, and Heck are not clear as to whether those individuals were aware of the best practices for street-crossing, but he also testified that the best practices, such as the ASCGG, were known and in existence prior to the accident in this case.

¶ 45 On June 20, 2023, the court heard arguments on Greenfields' motion for summary judgment. Subsequently, on August 25, 2023, the court granted the motion finding that plaintiff failed to present evidence of utter indifference or conscious disregard for student safety. The court concluded that, at most, the record supported a negligence claim, which was barred by statutory immunity. The court disposed of all remaining claims and dismissed the complaint with prejudice.

¶ 46 This timely appeal followed.

¶ 47                                    II. ANALYSIS

¶ 48 On appeal, plaintiff argues that (1) the circuit court erred in dismissing the negligence counts and finding that Greenfields was immune under section 34-84a of the School Code (105 ILCS 5/34-84a (West 2020)), and (2) the circuit court erred in granting summary judgment where there was evidence in the record demonstrating that Greenfields acted with utter indifference or conscious disregard for students' safety through its street-crossing policy.

¶ 49                          A. Dismissal of Negligence Counts

¶ 50     Plaintiff first argues that the circuit court erred in dismissing his negligence claims (counts V and VI) pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2020)) where he presented evidence of Greenfields' independent acts of negligence and therefore Greenfields should not have been granted statutory immunity. Greenfields responds that dismissal was proper because the alleged acts of negligence arise from the supervision and control of students, conduct that falls within the immunity afforded by section 34-84a of the School Code (105 ILCS 5/34-84a) (West 2020)).

¶ 51     A motion for involuntary dismissal under section 2-619(a)(9) of the Code admits the legal sufficiency of the complaint, accepts all well-pleaded facts as true, and contends that an affirmative matter outside the complaint defeats the action. 735 ILCS 5/2-619(a)(9) (West 2020). The defendant bears the initial burden of showing the existence of such an affirmative matter that negates the claim. *Gajda v. Steel Solutions Firm*, *Inc*., 2015 IL App (1st) 142219, ¶ 29. If the defendant successfully establishes an affirmative matter, the burden shifts to the plaintiff to show that the asserted defense is either unfounded or depends on a genuine issue of material fact. *Id*. If the plaintiff fails to meet this burden, the court may grant the motion and dismiss the complaint. *Id*. We review a circuit court's order granting a dismissal under section 2-619 of the Code *de novo*. *Doe v. Chicago Board of Education,* 339 Ill. App 3d 848, 853 (2003).

¶ 52     An affirmative matter for a section 2–619(a)(9) motion cannot merely refute well-pleaded facts; it must assert a completely new matter not present in the complaint. *Smith v. Waukegan Park District*, 231 Ill.2d 111, 121 (2008). In the instant case, the affirmative matter asserted by Greenfields was immunity from liability under section 34-84a of the School Code. That section provides as follows:

"Subject to the limitations of all policies established or adopted under Section 14–8.05, teachers, other licensed educational employees, and any other person, whether or not a licensed employee, providing a related service for or with respect to a student shall maintain discipline in the schools, including school grounds which are owned or leased by the board and used for school purposes and activities. In all matters relating to the discipline in and conduct of the schools and the school children, they stand in the relation of parents and guardians to the pupils. This relationship shall extend to all activities connected with the school program, including all athletic and extracurricular programs, and may be exercised at any time for the safety and supervision of the pupils in the absence of their parents or guardians." 105 ILCS 5/34-84a (West 2020).

Section 34-84a places teachers and other educational employees *in loco parentis* "for matters relating to the conduct of the schools and school children[,]" immunizing them (and by extension their employers) from ordinary negligence in the supervision, control, and discipline of pupils. *Doe ex rel. Doe v. Lawrence Hall Youth Services*, 2012 IL App (1st) 103758, ¶ 19. Further, public policy seeks to authorize and encourage "teachers to have broad discretion and latitude" "in matters relating to the teacher's personal supervision and control of the conduct or physical movement of a student." *Gerrity v. Beatty*, 71 Ill. 2d 47, 52 (1978). Thus, immunity is applicable to "ordinary negligence actions for accidents occurring in the course of the exercise of [disciplinary and supervisory authority]." *Jackson v. Board of Education,* 192 Ill. App. 3d 1093, 1098 (1989). However, the immunity has limits. It does not extend to a school district's independent administrative or property maintenance duties, *e.g.*, furnishing or maintaining safe equipment or premises. *O'Brien v. Township High School District 214*, 83 Ill. 2d 462, 469-71 (1980); *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 434 (1980);

*Sidwell v. Griggsville Community Unit School District No. 4*, 146 Ill. 2d 467, 472-73. (1992). Neither does the statute extend immunity for willful and wanton misconduct. *Kobylanski v. Chicago Board of Education*, 63 Ill. 2d 165, 173 (1976).

¶ 53    Illinois courts have recognized that private educational institutions performing the same supervisory functions as public educational institutions receive the same protection for ordinary negligence claims based on student supervision or control; the immunity analysis follows the function (supervision) rather than the nature of the institution. *Merrill v. Catholic Bishop of Chicago*, 8 Ill App. 3d 910, 911 (1972); *Lawrence Hall Youth Services*, 2012 IL App (1st) 103758, ¶ 18 (applying supervision immunity for a private residential educational facility).

¶ 54    Plaintiff maintains that the circuit court erred in dismissing the negligence claims because they were based on direct negligence by Greenfields, not vicarious negligence predicated on its employee, Heck. Specifically, plaintiff argues that Greenfields was independently negligent in failing to require two adult guides to escort students during the after-school program, failing to implement a written safety policy for crossing Elston Avenue, and failing to provide recognized safety equipment, such as reflective vests, to its staff. Relying on *McQueen* and *Sidwell*, plaintiff asserts that schools may be directly liable for their own acts or omissions independent of any teacher's conduct. *McQueen v. Green*, 2022 IL 126666, ¶ 37; *Sidwell*, 146 Ill. 2d at 472-73. Plaintiff further relies on *Lynch* and *Gerrity*, where it was held that schools have affirmative duties to provide students with safe equipment and environments to prevent student injury. *Lynch*, 82 Ill. 2d 415, 434 (1980); *Gerrity*, 71 Ill. 2d at 52. However, as discussed in the analysis below, these authorities are materially distinguishable from the circumstances presented here.

¶ 55    Greenfields responds that dismissal was proper because plaintiff's claims, despite being labeled as "direct negligence," fundamentally challenge the adequacy of Heck's supervision in an

area squarely protected by section 34-84a of the School Code. Section 34-84a confers *in loco parentis* status upon teachers and educational employees for "all matters relating to the discipline in and conduct of the schools and the school children," immunizing them and, by extension, their employers from ordinary negligence in supervision, control, or discipline. 105 ILCS 5/34-84a (West 2020). Greenfields contends that escorting children across Elston Avenue was a supervisory function connected with the school program. Thus, any alleged negligence, even if couched as an administrative failure, arises from the same supervisory duty. Because Heck would be immune from liability for ordinary negligent supervision, Greenfields argues it likewise cannot be held vicariously liable.

¶ 56    A careful reading of counts V and VI supports the circuit court's conclusion. The allegations in the 5AC state that Greenfields "maintained a policy which permitted only one employee to monitor children while crossing a busy roadway," "failed to have more than one employee monitoring children," and "failed to provide adequate safety equipment to ensure the safety of its students." These allegations all pertain to the staffing, oversight, and manner in which students were supervised while crossing Elston Avenue, core elements of the school's discretionary supervision. As our supreme court observed in *Gerrity*, immunity attaches when the claim arises "out of the teacher-student relationship in matters relating to the teacher's personal supervision and control of the conduct or physical movement of a student." *Gerrity*, 71 Ill. 2d at 52. We find the decision of how many adults are necessary to escort students, what equipment they should use, and how they should proceed through the intersection falls squarely within that sphere of discretionary supervision.

¶ 57    Plaintiff's reliance on *Sidwell*, *Lynch*, and *Gerrity* is also misplaced. Each of those cases involved claims arising from independent administrative or property-maintenance duties, such as

maintaining safe premises (*Sidwell*) or furnishing proper protective equipment (*Lynch*; *Gerrity*), rather than conduct involving student supervision. *Sidwell*, 146 Ill. 2d at 473; *Lynch*, 82 Ill. 2d at 435; *Gerrity*, 71 Ill. 2d at 52.

¶ 58     In *Sidwell*, the plaintiff alleged that the school district's negligence in allowing ruts to form on the playground resulted in his injuries from a fall. 146 Ill. 2d at 468-69. The trial court granted the school district immunity under the School Code. *Id.* at 469. Our supreme court reversed, holding that the immunity provision was inapplicable where the complaint clearly alleged that the district was "independently negligent because it allowed a rut to form and deepen in the playground, not that the teacher was negligent in allowing [the plaintiff] to use that part of the playground." *Id.* at 473. *Sidwell* is more akin to a premises liability case, where the school allowed a dangerous condition on the premises to persist. Here, however, plaintiff has alleged that the school did not properly monitor the students, which relates to the school's supervisory decisions and is distinct from negligence related to unsafe premises. See *Doe*, 2012 IL App (1st) 103758, ¶ 23 (distinguishing *Sidwell* where the plaintiff did not allege unsafe premises or equipment but claimed that the "defendant's employees negligently supervised him, allowing him to sneak off campus and engage in illicit activities").

¶ 59     This case is also materially different than both *Gerrity* and *Lynch.* In *Gerrity*, a high school football player was seriously injured during a game and alleged that the school district had provided him with a defective helmet. *Gerrity*, 71 Ill. 2d at 49. Although the district argued that teacher-supervision immunity barred the claim, our supreme court rejected that characterization, holding that the plaintiff need only prove ordinary negligence because the furnishing of equipment is an administrative function, not a supervisory one. *Id*. at 53. The case, therefore, fell outside the scope of immunity. *Id*. at 53.

¶ 60    Likewise, in *Lynch*, a student was injured while playing in an informal football game on school property, of which the administrators and teachers were aware. *Lynch*, 82 Ill. 2d at 416-418. The court upheld a jury verdict in favor of the student, finding that the district was negligent for failing to provide required helmets and face guards. *Id.* at 435. In so finding, the court noted that a school district has an affirmative duty to furnish necessary gear to students engaged in school activities to prevent serious injuries. *Id.* at 434.

¶ 61    In contrast, here, plaintiff does not allege that Greenfields failed to furnish protective equipment to students participating in an activity. Rather, plaintiff asserts that the school failed to provide adequate safety equipment to its employees to enhance student safety during a street crossing. Plaintiff cites no authority establishing a duty to equip employees with protective gear for this purpose, and the complaint alleges no facts from which such a duty could arise. Because the alleged omissions concern supervisory decisions rather than the furnishing of equipment to students, the principles underlying *Gerrity* and *Lynch* do not apply. See *Grandalski ex rel. Grandalski v. Lyons Township High School District 204*, 305 Ill. App. 3d 1, 5, 9 (1999) (distinguishing *Lynch* and holding that the school's failure to require the student to use a hand belt during gymnastics class fell under a teacher's supervisory authority immune from liability for negligence).

¶ 62    Moreover, counts V and VI contain only conclusory statements that Greenfields "owed a duty of ordinary care" and "failed to have more than one employee monitoring children" without identifying the legal source of that duty or how its breach proximately caused the injury. Illinois is a fact-pleading jurisdiction, and conclusory allegations unsupported by well-pled facts do not survive a motion to dismiss. *Purmal v. Robert N. Wadington & Associates*, 354 Ill. App. 3d 715, 720 (2004). Nothing in the pleadings establishes that Greenfields had a separate duty to provide

additional supervision beyond that exercised by Heck or that any administrative act independent of her conduct caused the incident. See *Palmer v. Mt. Vernon Township. High School District*, 169 Ill. 2d 551, 559-60 (1996) (distinguishing between the district's duty to furnish equipment and the teacher's duty to supervise its use). Here, the alleged negligence arises entirely from the supervision and control of students during a school-related activity, a function expressly protected by the School Code's immunity provision. 105 ILCS 5/34-84a (West 2020); see *Doe ex rel. Ortega-Prion v. Chicago Board of Education*, 339 Ill. App. 3d 848 (2003), *aff'd*, 213 Ill. 2d 19 (2004) (appellate court concluded that section 34-84a precluded holding the school board liable for ordinary negligence based on allegations that the student was sexually assaulted on a school bus as a result of the board's failure to ensure that a bus attendant was present and to employ adequate safety measures on the bus).

¶ 63  Finally, to the extent plaintiff relies on evidence developed after the dismissal, such as witness depositions, Bolandi's affidavit, or expert opinions produced during discovery to bolster his direct-negligence theory, that material is irrelevant to the section 2-619 analysis. Review under a section 2-619 dismissal is confined to the well-pled allegations of the complaint and matters appearing in the record at the time of the dismissal. *Groce v. South Chicago Community Hospital*, 282 Ill. App. 3d 1004, 1009 (1996); *Daniels v. Anderson*, 162 Ill. 2d 47, 58 (1994).

¶ 64  Counts V and VI, on their face, fail to allege an independent duty outside the scope of student supervision, and because the School Code immunizes ordinary negligence in that context, the circuit court properly concluded that an affirmative matter defeated the negligence claims. Accordingly, the court correctly dismissed those counts pursuant to section 2-619(a)(9).

¶ 65                                B. Summary Judgment

¶ 66    Plaintiff next argues that the circuit court erred in granting summary judgment as to the willful and wanton misconduct claims (counts VII and VIII) in favor of Greenfields. In particular, he contends that the record contains sufficient evidence to raise genuine issues of material fact as to whether Greenfields acted with conscious disregard or an utter indifference for the safety of its after-school students by failing to implement basic safety precautions despite knowing the inherent risks associated with child and motorist unpredictability. Plaintiff asserts that Greenfields' failure to (1) require more than one adult guide to escort children across Elston Avenue, (2) adopt a written safety plan or crossing-guard policy, and (3) provide extra safety equipment to enhance visibility during the street-crossing was willful and wanton conduct.

¶ 67    Greenfields responds that summary judgment was properly entered because the record, even when viewed in the light most favorable to plaintiff, shows that the school implemented a reasonable street-crossing protocol, provided verbal training for the street crossing, and equipped its after-school guide with a handheld stop sign for visibility. Greenfields emphasizes that no prior incidents, complaints, or warnings suggested the crossing was dangerous or required additional personnel or equipment. Greenfields maintains that its conduct reflects considered supervisory judgment, not reckless disregard, and that the evidence fails to meet the threshold required to establish willful and wanton misconduct.

¶ 68    Summary judgment is proper where the pleadings, depositions, admissions, and affidavits, when construed most favorably to the non-movant, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 2-1005(c) (West 2020). The party moving for summary judgment bears the initial burden of proof. *Bank Financial, FSB v. Brandwein*, 2015 IL App (1st) 143956, ¶ 40. That burden is satisfied when the movant either affirmatively demonstrates that a material element must be decided in its favor or shows that

the nonmoving party lacks evidence to support its claim. *Id*. Once the moving party satisfies this burden, the opposing party must identify a genuine issue of material fact. *Id*. "Mere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Id*. We are not limited to the trial court's reasoning and may affirm the judgment on any basis supported by the record. *Berglind v. Paintball Business Ass'n*, 402 Ill. App. 3d 76, 85 (2010). We review a circuit court's order granting summary judgment *de novo*. *Sears, Roebuck & Company v. Acceptance Insurance Co.*, 342 Ill. App. 3d 167, 171 (2003).

¶ 69    A claim of willful and wanton conduct is "an aggravated form of negligence." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 235 (2010). To sustain a claim of willful and wanton conduct, a plaintiff must establish the elements of negligence, as well as establish either a deliberate intention to harm or an utter indifference to or conscious disregard for the welfare of the plaintiff. *Biancorosso by Biancorosso v. Troy Community Consolidated School District No. 30C*, 2019 IL App (3d) 180613, ¶ 13. Effectively, "the plaintiff must demonstrate that the defendant knew of the impending danger and failed to exercise ordinary care to prevent it or recklessly and carelessly failed to discover the danger." *Id.* Whether conduct rises to that level depends on the facts and circumstances of each case and generally presents a question of fact unless the evidence overwhelmingly favors one party. *Barr v. Cunningham*, 2017 IL 120751, ¶ 15.

¶ 70    Here, plaintiff argues that Greenfields knowingly disregarded foreseeable dangers inherent in allowing a single adult to escort multiple students across a busy street during afternoon traffic. Plaintiff points to evidence that Greenfields required two adults for crossings during the regular school day but reduced the number to one for the after-school program, despite no material difference in the risk. Plaintiff also argues that Greenfields consciously declined to adopt the ASCGG which recommends multiple adults and reflective gear for high-traffic crossings, and that

Greenfields failed to implement a written safety plan detailing staff responsibilities for street crossings.

¶ 71    Plaintiff seeks to analogize this case to *Murray v. Chicago Youth Center*, 224 Ill. 2d 234 (2007). He argues that, like in *Murray*, Greenfields ignored obvious risks in favor of administrative convenience, creating sufficient evidence to create a question of fact for a jury.

¶ 72    In *Murray*, the plaintiff, a 13-year-old student, was severely injured after attempting a front flip off of a mini trampoline in an extracurricular tumbling class. *Id.* at 217. Our supreme court reversed the trial court's grant of summary judgment in favor of the defendant, ultimately holding that a question of fact existed as to whether youth center instructors acted willfully and wantonly by allowing unsupervised teenagers to perform trampoline flips during gymnastics class, despite knowing of prior injuries associated with the activity, explicit safety warnings, inadequate safety equipment, and it being a hazardous activity. *Id.* at 246.

¶ 73    We find *Murray* distinguishable. There, the defendant had specific knowledge of "the possibility of serious injury associated with trampolining" and disregarded express safety warnings while permitting an inherently dangerous activity. *Id.* at 243-246. In contrast, there is no evidence that Greenfields had notice of prior accidents, complaints, or hazards associated with its established crossing procedure. The record shows that Greenfields' administrators selected the crossing location after evaluating traffic and visibility, provided handheld stop signs for the guide to use, and trained staff in proper crossing techniques. These measures, although perhaps capable of improvement, reflect considered safety judgment rather than a reckless disregard for student safety. See *Barr*, 2017 IL 120751, ¶¶ 18, 23 (distinguishing *Murray* and holding that failure to require goggles during floor hockey, which was not "an obviously dangerous activity," was not

willful and wanton as the teacher implemented other safeguards to prevent injuries which showed that, "at most, she took insufficient precautions").

¶ 74    Plaintiff next argues that Greenfields should have required two adult guides. We are not persuaded by this argument. Illinois courts have repeatedly held that a school's failure to adopt the optimal level of supervision, standing alone, is insufficient to establish reckless disregard. *Castaneda v. Community Unit School District No. 200*, 268 Ill. App. 3d 99, 105 (1994) (finding teacher's decision not to accompany students at all times during bike ride did not constitute willful and wanton conduct); *Mancha v. Field Museum of Natural History*, 5 Ill. App. 3d 699, 702 (1972) (stating that "a teacher cannot be required to watch the students at all times while in school, on the grounds, or engaged in school-related activity"). As stated previously, there is no evidence that Greenfields had notice of prior safety incidents, or that the school disregarded known dangers requiring increased supervision. See *Jackson*, 192 Ill. App. 3d at 1101 (stating that willful and wanton misconduct requires evidence that the defendant knew, or should have known, "that the absence of supervision posed a high probability of serious harm or an unreasonable risk of harm"). Plaintiff presented no evidence that Greenfields' policy was made with indifference to known risks or warnings or that any staff member expressed concern about the adequacy of supervision prior to the accident. The law does not impose liability for willful and wanton conduct merely because, in hindsight, additional supervision might have prevented injury. *Palmer*, 169 Ill. 2d at 562.

¶ 75    Similarly, the failure to adopt a formal written policy or to follow external crossing guard guidelines does not elevate Greenfields' conduct to willful and wanton. Although a written policy might have promoted consistency, the absence of a written plan or incorporation of nonbinding recommendations does not, by itself, establish conscious disregard for safety. The failure to adopt or implement additional safety procedures could, in the ordinary course, conceivably give rise to

a negligence claim, but absent evidence of prior notice of danger or deliberate indifference to known risks, such omissions do not rise to the level of willful and wanton misconduct. See *Barr*, 2017 IL 120751, ¶ 18. Here, the record reflects that Greenfields maintained a health and safety policy and employee handbook that incorporated general safety expectations, provided verbal training, and relied on accreditation-based best-practice templates in formulating its policies and handbook. These measures contradict plaintiff's contention that the school wholly disregarded student safety by not having a written street-crossing policy.

¶ 76   Finally, plaintiff argues that Greenfields demonstrated an utter indifference to student safety by failing to equip its after-school guide with other visibility-enhancing gear, such as reflective vests. The record, however, does not support an inference that the absence of such equipment constituted reckless disregard. Testimony from multiple witnesses, including the driver involved in the collision, established that conditions were clear, visibility was unobstructed, and at least some daylight remained at the time of the accident. Plaintiff's expert acknowledged that he could not identify any evidence that diminished visibility caused the collision or that Heck's clothing directly contributed to the accident, nor does the record contain evidence that any state regulation, school accreditation standard, or safety agency required reflective vests for adults supervising such student crossings. Although plaintiff argues that defendant should have followed the ASCGG guidelines, those materials were recommendations, not binding mandates, and there was no evidence in the record that Huge, Heck, or Skinner were affirmatively aware of those guidelines, such that they could consciously disregard them. Additionally, Greenfields had successfully operated under its existing protocol for several years without incident or complaint.

¶ 77   As our supreme court emphasized in *Barr*, a defendant's failure to adopt additional safety measures, even those recommended by outside experts, does not rise to willful and wanton conduct

where the evidence shows that the defendant considered safety and implemented reasonable precautions. *Barr*, 2017 IL 120751, ¶ 24; *Bielema*, 2013 IL App (3d) 120808, ¶ 19 (summary judgment in favor of school district affirmed where the district "took some action to remedy the danger posed by" a spilled liquid even though more could have been done to warn the student). "[M]ere ineffectiveness does not show a course of action" demonstrating utter indifference or conscious disregard of students' safety. *Id.* Here, the absence of reflective vests or other safety equipment, given that it was not completely dark outside and there had been no prior accidents at that intersection, does not support an inference of utter indifference or conscious disregard for student safety.

¶ 78    In sum, because counts VII and VIII require evidence that Greenfields acted with deliberate intent to harm or with conscious disregard or utter indifference to a known, high probability of danger, and because the record contains no facts demonstrating that Greenfields or its employees were aware of such a risk or chose to disregard it, we conclude that plaintiff failed to establish a triable issue on the essential elements of willful and wanton misconduct. Plaintiff identified no evidence showing that Greenfields had prior notice of a specific danger associated with its street-crossing procedures, nor did he offer facts supporting an inference that the school consciously ignored a known hazard. For these reasons, the circuit court did not err in granting summary judgment in Greenfield's favor.

¶ 79                                  III. CONCLUSION

¶ 80    For the reasons stated, we affirm the judgment of the circuit court.

¶ 81    Affirmed.